*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0368P (6th Cir.)
File Name: 03a0368p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

THE ANTIOCH COMPANY,
*Plaintiff-Appellant,*

*v.*

WESTERN TRIMMING
CORPORATION,
*Defendant-Appellee.*

No. 02-3380

───────────────

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 98-00236—Walter H. Rice, Chief District Judge.

Argued: September 10, 2003

Decided and Filed: October 20, 2003

Before: MOORE and GILMAN, Circuit Judges; MILLS,
District Judge.[*]

_____

[*] The Honorable Richard Mills, United States District Judge for the
Central District of Illinois, sitting by designation.

───────────────

## COUNSEL

**ARGUED:** John B. Pinney, GRAYDON, HEAD &
RITCHEY, Cincinnati, Ohio, for Appellant. John E. Kelly,
KELLY, BAUERSFELD, LOWRY & KELLY, Woodland
Hills, California, for Appellee. **ON BRIEF:** John B. Pinney,
GRAYDON, HEAD & RITCHEY, Cincinnati, Ohio, Thomas
W. Flynn, WOOD, HERRON & EVANS, Cincinnati, Ohio,
Steven D.A. McCarthy, BIEBEL & FRENCH, Dayton, Ohio,
for Appellant. John E. Kelly, John D. Bauersfeld, KELLY,
BAUERSFELD, LOWRY & KELLY, Woodland Hills,
California, Charles J. Faruki, Gerald S. Sharkey, FARUKI,
IRELAND & COX, Dayton, Ohio, for Appellee.

───────────────

## OPINION

───────────────

RONALD LEE GILMAN, Circuit Judge. This appeal
involves the question of whether, as a matter of law, the
Antioch Company's scrapbook album configuration is
functional and therefore ineligible for trade dress protection.
By seeking trade dress protection for its album design,
Antioch is trying to bar Western Trimming Corporation
(Westrim) from selling "knock-off" copies of the album
format under the Westrim trademark. For the reasons set
forth below, we **AFFIRM** the district court's grant of
summary judgment for Westrim.

## I. BACKGROUND

### A. Factual background

Antioch produces and markets a scrapbook album under the
trademark "CREATIVE MEMORIES" that has several

distinctive features. The album utilizes a dual strap-hinge design that permits the pages to lie flat when the album is open, facilitates the turning of the pages, and enables the easy insertion of additional pages. Another design element of the CREATIVE MEMORIES album is its spine cover that conceals the dual strap-hinge, which causes it to be known as a "closed back" or "bookshelf" album. A third element of Antioch's album is the laminated, padded album covers. Finally, the CREATIVE MEMORIES album pages have ribbed edges that provide reinforcement, keep them separated, and hold the staples together. Antioch seeks trade dress protection for the CREATIVE MEMORIES album that encompasses these above-described features.

In 1997, Westrim, a competitor of Antioch in the hobby and craft industry, decided to copy the Antioch strap-hinge album in order to provide its customers with the functional benefits of the design. After determining that Antioch's patents that potentially covered the features in question had expired, Westrim developed and marketed its own version of the strap-hinge albums—the "Cherished Line" — under its existing "MEMORIES FOREVER" trademark. Through the use of its own distinctive logo and scroll work on the album covers, Westrim links the Cherished Line to its other photo, scrapbook, and related accessories in the MEMORIES FOREVER product line.

**B. Procedural background**

Westrim presented the Cherished Line products at a craft industry trade show on June 5, 1998. Antioch filed suit three days later, alleging trademark and trade dress infringement violations under the Lanham Act, 15 U.S.C. §§ 1051–1127, as well as various state-law claims for trademark infringement, unfair competition, and deceptive trade practices. It essentially protested Westrim's sale of an album that was virtually identical to its own. In addition, Antioch sought to immediately enjoin Westrim from introducing the

Cherished Line albums into the U.S. market pending resolution of the litigation.

On July 29, 1998, the district court denied Antioch's motion for a preliminary injunction, focusing its discussion primarily on the trademark infringement issue. The district court found that Westrim adopted Antioch's album design in order to achieve its functional benefits, not to confuse scrapbook enthusiasts about the supplier or source of the album. In an unpublished opinion, a prior panel of this court affirmed the district court's denial of a preliminary injunction, concluding that Westrim would probably defeat Antioch's claim of likelihood of confusion when the case went to trial. *Antioch Co. v. Western Trimming Corp.*, Nos. 98-3876, 98-3943, 1999 WL 777556, at *6 (6th Cir. 1999).

Although it found the oversight harmless, the prior panel acknowledged that the district court had not addressed the trade dress infringement issue. The panel, nonetheless, drew several tentative conclusions about the trade dress claim. In particular, it expressed skepticism regarding the distinctiveness and attachment of secondary meaning to the Antioch albums, and also observed that the contested spine cover was purely functional. *Id*. at *4.

Following the denial of the preliminary injunction and the clear indication that Antioch was unlikely to prevail on its trademark infringement claim, Antioch abandoned that cause of action. Antioch instead filed an amended complaint on March 13, 2000, focusing its efforts on its federal and common law trade dress claims, as well as implied passing-off claims under § 43(a) of the Lanham Act, 15 U.S.C. 1125(a), and Chapter 4165.02 of the Ohio Revised Code. The district court granted Westrim summary judgment on the implied passing-off claims on September 20, 2001. As a consequence, only the trade dress claims remained.

Antioch has alleged that Westrim's Cherished Line albums infringe on Antioch's CREATIVE MEMORIES album-configuration trade dress and page-configuration trade dress. Westrim moved for summary judgment on several grounds, one of which was that the album and page configurations were functional and thus not entitled to trade dress protection. Adhering to this court's decision in *Marketing Displays, Inc., v. TrafFix Devices, Inc.*, 200 F.3d 929 (6th Cir. 1999), the district court applied the "competitive-necessity" test to the trade dress claim. This test evaluates whether use of the particular album design was dictated by competitive necessity because the configuration was purely functional. Westrim's motion was denied because "the existence of alternative [album] designs was sufficient to raise a genuine issue of material fact" concerning the functionality of Antioch's album and page configurations. The district court did, however, invite Westrim to renew its motion for summary judgment if the Supreme Court, which at the time had under advisement the *TrafFix Devices* decision, altered the legal framework for assessing trade dress protection claims.

In *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23 (2001), the Supreme Court in fact reversed this court's prior decision and provided clarification regarding the appropriate test for evaluating whether a product was nonfunctional and thereby eligible for trade dress protection. Based upon the changed landscape after *TrafFix Devices*, Westrim renewed its motion for summary judgment in the district court. The district court subsequently granted Westrim's motion in accordance with the Supreme Court's *TrafFix Devices* guidance. *Antioch Co. v. Western Trimming Corp.*, 196 F. Supp. 2d 635, 643 (S.D. Ohio 2002). From this decision, Antioch appeals.

## II.  ANALYSIS

### A.  Standard of review

We review a district court's grant of summary judgment de novo. *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 629 (6th Cir. 2002). Summary judgment is proper where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B.  The legal test for trade dress infringement

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), protects a product's trade dress from infringement. To recover for trade dress infringement, however, the complaining party must "show that the allegedly infringing feature is not 'functional' . . . and is likely to cause confusion with the product for which protection is sought." *Wal-Mart Stores, Inc., v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000) (internal citation omitted); *see also Abercrombie & Fitch Stores, Inc., v. American Eagle Outfitters, Inc.*, 280 F.3d 619, 641 (6th Cir. 2002) (stating that, under 15 U.S.C. 1125(a)(3), the plaintiff has the burden of proving nonfunctionality). In addition, "a product's design is distinctive, and therefore protectible, only upon a showing of secondary meaning." *Wal-Mart Stores*, 529 U.S. at 216; *see also Gray v. Meijer, Inc.*, 295 F.3d 641, 645 (6th Cir. 2002) (explaining that trade dress protection is warranted where a product's trade dress has acquired secondary meaning in the marketplace, its

appropriated features are nonfunctional, and the infringing product's trade dress is confusingly similar to its own).

The district court's grant of summary judgment was based exclusively on the functionality factor of the trade dress infringement analysis. It concluded that, as a matter of law, Antioch's trade dress was functional. *Antioch*, 196 F. Supp. 2d at 643. Antioch contends on appeal that the district court misinterpreted the Supreme Court's guidance in *TrafFix Devices* regarding the appropriate tests for evaluating product functionality in the trade dress context. In particular, Antioch argues that the district court erred in reading *TrafFix Devices* to preclude consideration of evidence of alternative designs in order to gauge a product's functionality. Antioch also attacks what it perceives as the district court's exclusive focus on the functionality of individual components of the CREATIVE MEMORIES album, rather than evaluating the trade dress of the album as a whole. We will first review the guiding principles from *TrafFix Devices* and then take each of Antioch's contentions in turn.

### 1. Determining product functionality

In the decision underlying *TrafFix Devices*, this court evaluated the functionality of a traffic sign stand by examining whether a key feature was a "competitive necessity," i.e., whether the "[e]xclusive use of [the] feature . . . put[s] competitors at a *significant* non-reputation-related disadvantage." *Marketing Displays*, 200 F.3d at 940. (emphasis in original) (internal quotation marks omitted). To further implement the competitive-necessity test, this court queried whether there were alternative designs available to competitors to produce the equivalent product with the same functional benefits. The availability of alternative designs, in other words, would indicate that a company was not at a competitive disadvantage just because a key feature was monopolized by the originator of the design.

On *certiorari*, the Supreme Court reversed the *Marketing Displays* decision, explaining that this court erred in believing that the test for functionality was "whether the particular product configuration is a competitive necessity." *TrafFix Devices,* 532 U.S. at 32 (quoting *Marketing Displays*, 200 F.3d at 990). The Supreme Court clarified that the principal basis for assessing the functionality of a product design is the "traditional rule" originally set forth in a footnote in *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 850 n.10 (1982), that "a product feature is functional . . . if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." 532 U.S. at 32-33. Critical for the present case, the Supreme Court stated that "[w]here the design is functional under the *Inwood* formulation there is no need to proceed further to consider if there is a competitive necessity for the feature." *Id*. at 33. The Court went on to say that "[t]here is no need . . . to engage . . . in speculation about other design possibilities . . . which might serve the same purpose" where functionality is established. *Id*. In other words, "[e]ven if there are alternative designs available in the marketplace, they cannot turn a feature that is functional under the traditional . . . definition into a non-functional feature which is the exclusive trade dress property of one seller." 1 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 7:75 (4th ed. 2003).

The Supreme Court did not, however, reject the possibility that the competitive-necessity test might be applicable in certain contexts. Specifically, the Court stated that "[i]t is proper to inquire into a significant non-reputation-related disadvantage in cases of [a]esthetic functionality." *TrafFix Devices*, 532 U.S. at 33 (internal quotation marks omitted). This concept of "aesthetic functionality" originated from a comment in the 1938 version of the Restatement of Torts. 1 MCCARTHY, *supra* § 7:79. Although the Supreme Court has never directly addressed aesthetic functionality, Justice Breyer's opinion in *Qualitex Co. v. Jacobson Products Co.,*

514 U.S. 159, 170 (1995), proposed in dicta that where an aesthetic feature (like color), serves a significant function—such as helping an individual distinguish between a heart pill and a digestive tablet—courts should examine whether the exclusive use of that feature by one supplier would interfere with legitimate competition. See also *Abercrombie & Fitch Stores,* where this court explained that the "competitive disadvantage [test] did not displace the traditional functionality standard from *Inwood*," but rather that it was most "adaptable to the problem of aesthetic functionality." 280 F.3d at 641.

A leading treatise, on the other hand, opines that "[a]esthetic functionality is an oxymoron," 1 MCCARTHY, *supra* § 7:81, and reports that a majority of courts have rejected the concept. *Id*. at § 7:80. Because there is no suggestion that the Antioch scrapbook album is "aesthetically functional," we need not address the validity of the concept any further.

Since the Supreme Court decided *TrafFix Devices,* however, at least one circuit and a leading treatise author have expressed their views that the availability of alternative designs may be helpful in applying the traditional *Inwood* test for functionality. *See Valu Engineering, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1276 (Fed. Cir. 2002) (commenting that the availability of alternative designs can be "a legitimate source of evidence to determine whether a feature is functional in the first place"); 1 MCCARTHY, *supra,* § 7:75 (stating his personal view that evidence of alternative designs can be useful in evaluating whether the design "is essential to the use or purpose of the article").

We need not resolve the question of whether evidence of alternative designs has a place outside of the competitive-necessity test because, at the very least, a court is not *required* to examine alternative designs when applying the traditional test for functionality. That much is clear from *TrafFix*

*Devices*, where the Supreme Court applied *Inwood* in a straightforward fashion, without looking at alternative designs, and found that the dual-spring design of the traffic sign stand in question was essential to the stand's purpose because it kept the sign upright during inclement weather. 532 U.S. at 33. Although the *TrafFix Devices* decision does not fully resolve the uncertainties of trade dress protection, these uncertainties do not affect the present case. The traditional *Inwood* test for functionality is the main rule, and if a product is clearly functional under *Inwood*, a court need not apply the competitive-necessity test and its related inquiry concerning the availability of alternative designs.

**2.    *The district court properly applied the traditional rule for assessing the functionality of Antioch's product design and correctly rejected evidence of alternative designs***

The district court's opinion in the present case conveys the impression that the court understood *TrafFix Devices* to categorically reject the competitive-necessity test in all instances. In deciding what test to apply, the district court stated:

The Defendant initially argues that, in light of the Supreme Court's decision in *TrafFix Devices*, the Sixth Circuit's competitive need test is no longer applicable. This Court agrees, since the Sixth Circuit adopted that test in its decision in *TrafFix Devices*, a decision which the Supreme Court reversed. Accordingly, this Court will not apply the rejected, competitive need test when ruling upon the Defendant's Renewed Motion for Partial Summary Judgment. As a consequence, the Court will not consider whether alternative designs exist, when ruling upon that motion.

*Antioch*, 196 F. Supp. 2d at 640 (internal citations omitted). The district court went on to apply the traditional rule that

"product configuration trade dress is functional when it is essential to the use or purpose of the device or when it affects the cost or quality of the device." *Id*. at 641 (quoting *TrafFix Devices*, 532 U.S. at 33).

Antioch argues that the district court misinterpreted *TrafFix Devices* by allegedly determining that the competitive-necessity test was "rejected" and "no longer applicable." We opt for a more benign interpretation of the district court's opinion; namely, that the district court correctly concluded that the Supreme Court "rejected" the competitive-necessity test as the main test and reinstated the *Inwood* formulation as the primary method for evaluating functionality. The district court presumably determined that the competitive-necessity test was "no longer applicable" to the matter before it because the Antioch v. Westrim trade dress dispute does not concern aesthetic functionality. As stated above, the competitive-necessity inquiry is still viable in limited circumstances that do not exist in the present case. *See TrafFix Devices*, 532 U.S. at 33.

Although the district court's opinion leaves room for conflicting interpretations in its discussion of *TrafFix Devices*, the outcome of the present case is unaffected because the court properly applied the traditional rule from *Inwood*. It concluded that "the essential feature of [Antioch's] claimed product configuration trade dress is its dual strap hinge design, which is unquestionably functional." *Antioch*, 196 F. Supp. 2d at 642. The straps both hold the album together and produce the advertised functional benefits of allowing the pages to lie flat when the album is open, permitting their easy turning, and enabling the insertion of additional pages. *Id*. Referring to this court's prior skepticism about the distinctiveness of the spine cover, the district court concluded that Antioch had not raised any evidence that would create a genuine issue of material fact as to whether a spine cover was anything other than functional. *Id*. The district court also determined that the laminated,

padded album covers were functional. *Id*. Finally, the district court concluded that Antioch's claimed trade dress regarding the album's pages was purely functional because the ribbed edges had the effect of "reinforcing the pages; keeping the pages separated, and thus, permitting air to circulate between them; and holding the staples in place on a particular page." *Id*.

The dual strap-hinge design, spine cover, padded album cover, and reinforced pages are all components that are essential to the use of Antioch's album and affect its quality. We thus agree with the district court's conclusion that there was no genuine issue of material fact regarding the functionality of Antioch's album under the traditional *Inwood* test. In accordance with *TrafFix Devices*, the district court therefore committed no error in rejecting the proffered evidence concerning the availability of alternative album designs.

### 3. The district court correctly concluded that Antioch's claimed trade dress was functional as a whole

Antioch's remaining contention is that the district court misapplied trade dress protection law because it focused on the functionality of individual elements of the album's trade dress rather than the trade dress as a whole. The district court reasoned that Antioch's album and page designs did "not constitute protectable trade dress since the components of that trade dress are functional." *Antioch*, 196 F. Supp. 2d at 643. In its opinion, the district court was perhaps too categorical in summarily rejecting Antioch's argument that the court had to consider whether the overall configuration of the album was functional, rather than focusing exclusively on its component parts. *Id*. at 642 ("This Court cannot agree."). Antioch, in fact, is technically correct that an overall design combination may be deserving of trade dress protection even if the

individual elements are functional, but errs in its contention that this principle is applicable to the present case.

In *Abercrombie & Fitch Stores*, this court acknowledged that the Abercrombie clothing catalog could be considered nonfunctional even though its individual elements were functional: "Even if the elements [of the Abercrombie catalog] were all separately functional, . . . A&F's arrangement of these features can constitute more than the sum of its non-protectable parts." 280 F.3d at 644. Other circuits are in agreement. *See Publications Int'l, Ltd., v. Landoll, Inc.*, 164 F.3d 337, 342 (7th Cir. 1998) ("Although none of the functional features of PIL's cookbooks can be appropriated to serve as a trade dress, it doesn't follow that the ensemble cannot be."); *Hartford House, Ltd., v. Hallmark Cards, Inc.*, 846 F.2d 1268, 1272 (10th Cir. 1988) ("A combination of features may be nonfunctional and thus protectable, even though the combination includes functional features."); *Fuddruckers, Inc., v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 842 (9th Cir. 1987) ("We examine trade dress as a whole to determine its functionality; functional elements that are separately unprotectable can be protected together as a part of a trade dress.") (internal citation omitted).

What Antioch glosses over, however, is that in order to receive trade dress protection for the overall combination of functional features, those features must be configured in an arbitrary, fanciful, or distinctive way. See *TrafFix Devices*, 532 U.S. at 34, where the Supreme Court rejected the trade dress protection claim because the sign manufacturer "has pointed to nothing arbitrary about the components of its device or the way they are assembled." In other words, where individual functional components are combined in a nonarbitrary manner to perform an overall function, the producer cannot claim that the overall trade dress is nonfunctional.

The district court relied on the following articulation of this principle in *Leatherman Tool Group, Inc. v. Cooper Industries, Inc.*, 199 F.3d 1009, 1013 (9th Cir. 1999):

> [W]here the whole is nothing other than the assemblage of functional parts, and where even the arrangement and combination of the parts is designed to result in superior performance, it is semantic trickery to say that there is still some sort of separate "overall appearance" which is non-functional.

In *Leatherman*, the plaintiff sought trade dress protection for a multi-purpose pocket knife. The court found that all of the elements (tool size, shape of handle, shape of tool blades, etc.) were chosen as part of the engineering design for the final product, so that even the overall appearance of the tool was functional. *See also Tie Tech, Inc., v. Kinedyne Corp.*, 296 F.3d 778, 786 (9th Cir. 2002) (refusing to grant trade dress protection to the overall appearance of a device designed to cut through wheelchair-securement webbing that was comprised of separate interlocking functional parts); *Eppendorf-Netherler-Hinz GMBH v. Ritter GMBH*, 289 F.3d 351, 358 (5th Cir. 2002) (holding that trade dress protection was unwarranted where the eight design elements of a disposable pipette tip were functional and essential to the overall operation of the product).

As in *Leatherman*, *Tie Tech*, and *Eppendorf*, where engineering necessity influenced the configuration of the functional components, the main functional benefit of Antioch's album is the result of an engineering feature—the dual strap-hinge. Although the district court did not reach the question of whether Antioch's array of expired utility patents covered the features of the album's trade dress, the court did point out that Antioch's advertising "touted its patented strap hinge design as allowing pages to lie flat, as well as permitting pages to be turned and added easily." *Antioch*, 196 F. Supp. 2d at 642. The other features of Antioch's album

work in sync with the dual strap-hinge to provide the user with the advertised benefits. "[B]uyers are assured the product serves its purpose" when they "see[] the operative mechanism." *TrafFix Devices*, 532 U.S. at 34. *TrafFix Devices* teaches that where an engineering design feature is the core component of the overall trade dress, a court may focus on the functionality of that key feature.

In *TrafFix Devices*, the traffic device for which the designer sought protection was comprised of a dual-spring mechanism, four legs, a base, an upright, and a sign. *Id*. The Supreme Court focused exclusively on the dual-spring design as the essential feature of the configuration and dismissed the other elements of the claimed trade dress as superfluous. Because the dual-spring design was "the reason the device works," the Court held that the overall product was functional. *Id*. The district court in the present case made an apt analogy:

> In *TrafFix Devices*, the Supreme Court held that the dual-spring design was the central component of the claimed trade dress. Herein, this Court notes that the essential feature of the Plaintiff's claimed product configuration trade dress is its dual strap hinge design, which is unquestionably functional.

*Antioch*, 196 F. Supp. 2d at 642. In sum, where one key functional feature is the reason that the product works, whether it is a dual-spring or a dual strap-hinge, then the entire product configuration may be considered functional and not deserving of trade dress protection.

In addition, where the claimed trade dress is actually a *type* of product, one supplier may not monopolize the configuration to the exclusion of others. Antioch argues in its brief that Westrim could produce other types of albums, like a post-bound album, which provides many of the same functional benefits as the dual strap-hinge album. That possibility is irrelevant. The Supreme Court in *TrafFix*

*Devices* made clear that if a particular design is functional, other producers do not have "to adopt a different design simply to avoid copying it." 532 U.S. at 35. Likewise, this court in *Abercrombie & Fitch Stores* pointed out that for "generic product configurations . . . no designer should have a monopoly on designs regarded by the public as the basic form of a particular item." 280 F.3d at 638.

The Seventh Circuit case of *Publications Int'l Ltd. v. Landoll, Inc*., 164 F.3d 337 (7th Cir. 1998), illustrates the principle that trade dress protection is unavailable for overall functional designs that represent a type of product. Publications International Ltd. (PIL) sought protection for its cookbook's trade dress that contained the following functional features: large pages (easier to lay flat on the counter), large print font (easier to read while cooking), an oil cloth cover (easier to clean), large pictures of dishes (to entice the reader to try the recipe), and gilded page edges (to eliminate the picture prints "bleeding" over the edge). *Id*. at 341-42. The Seventh Circuit observed that trade dress protection was not appropriate because "it was the only way the product *could* look, consistent with its performing each of the product's functions optimally." *Id*. at 342 (emphasis in original). It denied trade dress protection to PIL because

> [e]very producer of a cookbook has to worry about the cover getting spattered, the cook having difficulty laying the book flat and reading small print from a distance, the photos of the food dishes being too small to entice and inspire, the book as a whole looking cheap, and the pages . . . presenting a ragged appearance because the color pictures that fill them bleed to the end of the page. Because of these concerns that are common to all publishers of fancy cookbooks, it is not surprising that more than one publisher would find it optimal, wholly apart from any desire to confuse consumers about the publisher's identity, to use the very combination of features that PIL claims compose its trade dress . . . .

*Id.* at 342-43. The court went on to point out that PIL was free to adopt a distinctive logo, design, and typeface on its cookbooks to distinguish them from those of its competitors, but that it could not monopolize this *type* of cookbook. *Id.* at 343.

This case presents an analogous situation. Antioch's original album design brought together several features—the dual strap-hinge, the concealed binding, the padded album covers, and the reinforced pages—that allowed the overall album to function optimally. This type of scrapbook album meets the functional demands of scrapbook enthusiasts who want the ability to easily add pages to their albums, who like having the pages turn freely and lie flat when opened, and who prefer the aesthetic appearance of the covered spine.

Westrim's use of its own distinctive logo, scrollwork, stickers, and face sheet provide sufficient signals to scrapbook buyers that its albums are not made by Antioch, and Antioch has not contended otherwise. *See Abercrombie & Fitch Stores*, 280 F.3d at 647-48 (holding that even if the overall Abercrombie catalog trade dress was nonfunctional, no rational trier of fact would confuse it with the American Eagle catalog because of their different styles and the placement of each company's trademarks "on practically every page"). Just as PIL cannot monopolize a particular type of cookbook, Antioch cannot monopolize a particular type of scrapbook album. We therefore find no reversible error in the district court's analysis of Antioch's overall trade dress claim.

Affirming the district court's decision is also consistent with the general public policy behind trade dress protection as elaborated by the Supreme Court and adopted in this circuit. Antioch repeatedly attacks Westrim for slavishly copying the CREATIVE MEMORIES album. What Antioch fails to appreciate is that "copying is not always discouraged or disfavored" and can have "salutory effects." *TrafFix Devices*, 532 U.S. at 29. "[C]opying preserves competition, which

keeps downward pressure on prices and encourages innovation." *Abercrombie & Fitch Stores*, 280 F.3d at 640. As the Supreme Court has advised, "[t]rade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products." *TrafFix Devices,* 532 U.S. at 29. Unless an intellectual property right protects a product, "competitors are free to copy at will." *Abercrombie & Fitch Stores,* 280 F.3d at 640.

Trade dress protection, in sum, is not available for functional products. Otherwise, "trademark law, which seeks to promote competition by protecting a firm's reputation," would "instead inhibit[] legitimate competition by allowing a producer to control a useful product feature." *Qualitex,* 514 U.S. at 164. The district court, therefore, did not err in denying Antioch trade dress protection for the CREATIVE MEMORIES album. Had the court done otherwise, Antioch would have enjoyed a monopoly in perpetuity for this type of scrapbook album, an outcome in conflict with our "laws that preserve a competitive economy." *TrafFix Devices*, 532 U.S. at 29.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the decision of the district court.