*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0312p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

FUJI KOGYO CO., LTD,

  *Plaintiff-Appellant,*

  *v.*

No. 05-5854

PACIFIC BAY INTERNATIONAL, INC., et al.,

  *Defendants-Appellees.*

---

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 02-00042—William J. Haynes, Jr., District Judge.

Argued: April 19, 2006

Decided and Filed: August 23, 2006

Before: BOGGS, Chief Judge; SUTTON, Circuit Judge; and SCHWARZER, District Judge.[*]

---

## COUNSEL

**ARGUED:** William J. Utermohlen, OLIFF & BERRIDGE, Alexandria, Virginia, for Appellant. Hugh F. Bangasser, PRESTON, GATES & ELLIS, Seattle, Washington, for Appellees. **ON BRIEF:** William J. Utermohlen, James A. Oliff, Darle M. Short, OLIFF & BERRIDGE, Alexandria, Virginia, William L. Harbison, SHERRARD & ROE, Nashville, Tennessee, for Appellant. Hugh F. Bangasser, PRESTON, GATES & ELLIS, Seattle, Washington, Theresa L. Keyes, PRESTON, GATES & ELLIS, Spokane, Washington, Stephen H. Price, STITES & HARBISON, Nashville, Tennessee, Mark J. Patterson, Emily A. Shouse, WADDEY & PATTERSON, Nashville, Tennessee, Kent E. Krause, BREWER, KRAUSE, BROOKS, CHASTAIN & BURROW, Nashville, Tennessee, for Appellees.

---

## OPINION

---

BOGGS, Chief Judge. Plaintiff Fuji Kogyo Co., appeals the decision of the district court dismissing its suit to enjoin its competitors, the Defendants, Pacific Bay International, Inc., Batson Enterprises, Inc., and Amtak Limited, from selling fishing line guides that allegedly infringe its registered and unregistered trademarks. The district court cancelled three of Fuji's registered trademarks because it found them to be functional and therefore unprotectable. We affirm.

---

[*]The Honorable William W Schwarzer, United States District Judge for the Northern District of California, sitting by designation.

1

# I

This is a trademark infringement case brought by a Japanese maker of fishing tackle against American distributors of competing goods.  The goods at issue are fishing line guides.  A line guide, not surprisingly, guides fishing line along the axis of a fishing rod.  It consists of a frame and ring.  The ring guides the line and the frame holds the ring.  The frame has legs that attach to the ring and feet that mount to the rod.  Different guides have different fishing uses.  For example, lighter guides are used on fly rods or fresh water spinning rods, while heavier guides are used on rods that require little casting or heavier bait.  Line guides transmit the force of a caught fish and the weight of the lure to the rod.  Strength in several dimensions is as important as flexibility.  A line guide should be light, aerodynamic when the rod is in motion, and resist line entanglement.

Fuji is a family run company; the President is the grandson of the founder, Rindtaro Ohmura, who began manufacturing various products, including elastic watch bands, in 1945.  In 1960, Fuji began to manufacture fishing tackle and, in 1965, fishing tackle exclusively.  Early in its history, Fuji's competitors copied and manufactured an original Fuji watchband design to Fuji's detriment.  To avoid this fate, it became Fuji's policy not to manufacture any product without some form of intellectual property protection.  Accordingly, with regard to the products concerned in this case, Fuji has been granted three trademark registrations, four utility patents, and seven design patents within the United States.

Fuji initially protected its innovative product design through United States utility patents.  Four patents are here relevant and they are depicted, along with their grant dates, in Figure 1.  All of these patents teach a method of manufacture where the line guide is formed from a single piece of sheet metal, hole-punched, and bent into the finished shape.  The guides at issue in this case are also made by stamping and forming.  Figure 1a illustrates how Fuji's model N line guide is made from forming stamped metal.

**Figure 1**



| Pat. #3,690,027 | Pat. #3,780,684 | Pat. #4,176,488 | Pat. #4,215,504 |
| Sep. 12, 1972 | Dec. 25, 1973 | Dec. 4, 1979 | Aug. 5, 1980 |

**Figure 1a**



Next, to achieve further protection from competition, Fuji applied for and was granted seven design patents. These patents, their grant dates, and the models they relate to, if discernible from the record, are illustrated in Figure 2.

**Figure 2**



Des. 237,175
Oct. 14, 1975
(N)

Des. 256,714
Sep. 2, 1980
(LR)

Des. 256,718
Sep. 2, 1980

Des. 261,918
Nov. 17, 1981
(LV)

Des. 261,919
Nov. 17, 1981

Des. 271,127
Oct. 25, 1983
(SV)

Des. 273,692
May 1, 1984

At least as early as 1982, Fuji enforced its patents against perceived infringement through letters to competitors and threats of litigation. However, examples of the allegedly infringing designs against which Fuji took action are not included in the record.

As its utility and design patents began to expire, the company learned of a competitor using trademark law to protect its designs. *See, e.g.,* 15 U.S.C. §§ 1051–1141. So, in 1993, Fuji began to register its product designs as trademarks. However, only three of the four claimed trademarks in this case were eventually registered because Fuji found that the registration process was costly and time consuming, taking more than nine years. Some of this expense can be attributed to defendant Pacific Bay's opposition to Fuji's registration. Fuji's registered and claimed trademarks

are illustrated in Figure 3. Fuji's trademark claims were limited, covering only a portion of the entire design—the solid portions of the LV, SV, and N models in the illustrations. The mark that is claimed is represented by legs that "essentially form[] a V-configuration." *See, e.g.,* U.S. Trademark Reg. No. 2,499,250.

**Figure 3**



| LV | SV | N | LR |
|---|---|---|---|
| Reg. #2,499,250 | Reg. #2,499,249 | Reg. #2,557,505 | No Reg. |
| Oct. 23, 2001 | Oct. 23, 2001 | Apr. 9, 2002 | |

Fuji distributes its products in the United States exclusively through Anglers Resource. None of the defendants manufactures line guides. The three defendants, Pacific Bay, Batson, and Amtak, all compete against Anglers Resource by importing and reselling allegedly infringing line guides.

Fuji's complaint was filed January 11, 2002. It stated causes of action for trademark infringement pursuant to 15 U.S.C. § 1114, counterfeiting of goods in violation of 15 U.S.C. § 1125(a), and parallel claims under the laws of Tennessee. All of the claims proceeded to a bench trial conducted by Judge Haynes in September 2003. In a lengthy memorandum opinion and judgment issued April 22, 2005, the district court dismissed the trademark claims at issue here and cancelled all of Fuji's asserted trademark registrations pursuant to 15 U.S.C. § 1119. *See Fuji Kogyo Co. v. Pac. Bay Int'l*, No. 02-42 (M.D. Tenn.) [hereinafter *Fuji*]. It is from this judgment that Fuji appeals.

The district court concluded that the trademarked product configurations were functional and therefore could not be protected. *Id.* at 61. The district court looked mainly to Fuji's own statements within its expired utility patents to make its functionality determination. *Ibid.*. Additionally, the court noted Fuji's statements in advertising and other documents introduced as further evidence of the functionality of the product configurations. *Id.* at 62. The court noted that Fuji's proof reflected consumer recognition of the functionality of the designs. *Ibid.* Finally, the court noted that since the expert witnesses at trial were divided about the functionality of the trademarked configurations (with the court crediting the plaintiff's expert more) it held that this evidence was outweighed by Fuji's statements within its patents. *Id.* at 63. The court held that "the curved legs of Fuji's four line guides are wholly functional and thus are not entitled to continued trademark protection," "with any aesthetics being a byproduct" of that function. *Ibid.*

**II**

We review the legal conclusions of the district court de novo. *United States v. Morgan*, 435 F.3d 660, 663 (6th Cir. 2006) (citing *United States v. Harris*, 192 F.3d 580, 584 (6th Cir.1999)). In this regard, "a district court's allocation of the burden of proof is a question of law subject to de novo appellate review." *First Tenn. Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 326 (6th Cir. 2001).

"Functionality [in a trademark case] is a factual determination reviewed only for clear error." *Ferrari S.P.A. v. Roberts*, 944 F.2d 1235, 1246 (6th Cir. 1991) (citing *LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 77 (2d Cir. 1985)). A factual conclusion is clearly erroneous only when we are "left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

## III

### A

A United States utility patent grants the holder a monopoly right to an invention for a term of years, generally twenty years from the date of filing. *See* Uruguay Round Agreements Act, § 532(a)(1), 35 U.S.C. § 154(a)(2) (1994). "[T]he ultimate goal of the patent system is to bring new designs and technologies into the public domain through disclosure." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 151 (1989). "From their inception, the federal patent laws have embodied a careful balance between the need to promote innovation and the recognition that imitation and refinement through imitation are both necessary to invention itself and the very lifeblood of a competitive economy." *Id.* at 146. Importantly, grant of a patent requires disclosure of a specification that can be copied by future imitators:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

35 U.S.C. § 112. When the patent requirements of novelty, nonobviousness, and utility are met, and the applicant reveals the "best mode contemplated" of harnessing the invention, an exclusive right is granted. *See Bonito Boats*, 489 U.S. at 150. However, when that period expires, the other component of the "carefully crafted bargain" obtains: "knowledge of the invention inures to the people, who are thus enabled without restriction to practice it and profit by its use." *Id.* at 151. Again, the public are the ultimate beneficiaries of the patent holder's genius:

> First, patent law seeks to foster and reward invention; second, it promotes disclosure of inventions, to stimulate further innovation and to permit the public to practice the invention once the patent expires; third, the stringent requirements for patent protection seek to assure that ideas in the public domain remain there for the free use of the public.

*Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262 (1979).

Before considering the district court's findings of fact, we note that Fuji's model N guide is nearly identical to the specification disclosed in the '027 patent as the preferred embodiment of its invention. In this case, Fuji has sought to trademark a patent's disclosed specification for a product that is utilitarian and unadorned. On the strength of this identity, the obvious utility of the design, and the method disclosed for fashioning line guides in the '027 patent, this design must be considered now to be in the public domain. Further, Fuji's LR-type guide is substantially identical to the specification disclosed in the '504 patent. For the same reasons, this design should also be considered in the public domain. When a utility patent expires, "there passes to the public the right to make the machine in the form in which it was constructed during the patent." *Singer Mfg. Co. v. June Mfg. Co.*, 163 U.S. 169, 185 (1896). As an inescapable consequence of this right, a court may not prevent an individual skilled in the art of line guide manufacture from duplicating the specification disclosed in either the '027 or '504 patent and creating guides identical to the N and

LR models.  *See* 35 U.S.C. § 112.  Therefore, based solely upon our understanding of patent law, the district court was justified in cancelling Fuji's '505 registration and dismissing its claims based upon its unregistered LR design.

B

The Lanham Act defines a trademark as "any word, name, symbol, or device" used or intended to be used in commerce "to identify and distinguish . . . goods . . . from those manufactured or sold by others."  15 U.S.C. § 1127.  Registration of a mark entitles the owner to sue for infringement and bestows upon the mark a presumption of validity in that suit under 15 U.S.C. § 1114.  *See Wal-Mart Stores v. Samara Bros., Inc.*, 529 U.S. 205, 209 (2000).  The owner of an unregistered mark may also sue for infringement.  *See* 15 U.S.C. § 1125(a); *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 629 (6th Cir. 2002).

The design of a product, as well as the packaging of the product, both part of its "trade dress," may form the basis of a suit under the Lanham Act.  *See Samara Bros.*, 529 U.S. at 209–10.

> It is well established that trade dress can be protected under federal law.  The design or packaging of a product may acquire a distinctiveness which serves to identify the product with its manufacturer or source; and a design or package which acquires this secondary meaning, assuming other requisites are met, is a trade dress which may not be used in a manner likely to cause confusion as to the origin, sponsorship, or approval of the goods.  In these respects protection for trade dress exists to promote competition.

*TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28 (2001).

If a product's design is functional, that design cannot serve as a trademark.  *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 164 (1995); 15 U.S.C. § 1052(e)(5) "The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature."  *Ibid.*  That is the province of patent law.  Therefore, "trade dress protection may not be claimed for product features that are functional."  *TrafFix*, 532 U.S. at 29.

Registration of a trademark gives rise to a rebuttable presumption that the trademark is valid.  The burden falls on a challenger to rebut this presumption.  *See Talking Rain Beverage Co. Inc. v. S. Beach Beverage Co.*, 349 F.3d 601, 603 (9th Cir. 2003); *Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 594 (6th Cir. 1989).  Under the Lanham Act, the party asserting trade dress protection without registration has the burden of proving that the matter sought to be protected is not functional.  15 U.S.C. § 1125(a)(3); *TrafFix*, 523 U.S. at 29.

Separate from trademark protection and utility patent, the statute allows for an original ornamental design to be patented.  35 U.S.C. § 171.  "A design patent is directed to the appearance of an article of manufacture."  However, "[i]f the particular design is essential to the use of the article, it can not be the subject of a design patent."  *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1123 (Fed. Cir. 1993) (citations omitted).  A design patent, counter to a utility patent, is presumptive evidence of nonfunctionality, evidence that may support a similar trademark claim.  *See In re Morton-Norwich Prods., Inc.*, 671 F.2d 1332, 1342 n.3 (C.C.P.A. 1982); *Topps Co. Inc. v. Gerrit J. Verburg Co.*, 41 U.S.P.Q.2d 1412 (S.D.N.Y. 1996).  The existence of design patent does not preclude the same product from protection as a trademark under the Lanham Act either simultaneously or successively.  *See Kohler Co. v. Moen Inc.*, 12 F.3d 632, 638 (7th Cir. 1993) (noting that a trademark owner has an indefinite term of protection and must also prove secondary meaning and likelihood of confusion in an infringement suit, which the owner of a design patent need not do); *In re Honeywell Inc.*, 8 U.S.P.Q.2d 1600, 1601 (P.T.O. T.T.A.B. 1988); *Application*

*of Mogen David Wine Corp.*, 372 F.2d 539, 540 (C.P.P.A. 1967). After fourteen years, the ornamental design contained in a design patent "passes into the public domain." *Compare* 35 U.S.C. § 173 (granting fourteen years for design patents) *with* 35 U.S.C. § 154 (granting twenty years for utility patents).

The design patents in this case do little to help resolve the merits. For example, while the product described in the '714 design patent is almost identical to that in the '488 utility patent, the utility patent presents a presumption of functionality and the design patent presents a presumption of nonfunctionality. Clearly, the variety of intellectual property in this case demonstrates that the issue cannot be decided through evidentiary presumptions. This type of contradiction cannot be resolved without a trial. The district court was correct in evaluating and weighing all the evidence and in not relying on the aggregate of the statutory presumptions. Therefore, it was not error for the district court to fail to make a formal accounting of each of the statutory burdens in its written opinion in a ritualistic manner. *See United States v. Johnson*, 403 F.3d 813, 816 (6th Cir. 2005) ("ritual incantation" of sentencing factors by the district court is not necessary) (quoting *United States v. Washington*, 147 F.3d 490, 490–91 (6th Cir.1998)); *United States v. Manarite*, 44 F.3d 1407, 1419 (9th Cir. 1995) (a district court need not mechanically recite Fed. R. Evid. 403's requirements before admitting evidence).

The district court held that all three of Fuji's registered trademarks were functional and that its one unregistered mark was functional as well. *Fuji* at 63. Although Fuji argues extensively about the presumption of nonfunctionality bestowed upon its asserted marks by statute, it cannot eliminate the fact that Defendants have overcome this presumption through their proofs. In addition to the utility patents on the record, Defendants presented printed materials constituting admissions by Fuji, testimony by lay witnesses regarding the functionality of the designs, and the testimony of expert witnesses as well.

Defendants offered lay witnesses who testified that the curved legs "act as shock absorbers and reduce the occurrences of line entanglement [more] than line guides with straight legs," *Fuji* at 25, and experts who opined that "Fuji's curved leg line guide is stronger and more able to withstand shock and torque in the lateral direction than a comparable line guide with straight legs," *id.* at 32. Fuji's expert countered that the line guide tested with straight legs was stronger than Fuji's trademarked curved configuration and cheaper to manufacture. *Id.* at 26–33. The credentials and testimony of the opposing experts were impressive. When credited by the district judge, either was enough to rebut a presumption of functionality or non-functionality. The district court was charged with weighing the evidence in this case and making a determination by a preponderance of the evidence. We cannot say that the court's conclusion was erroneous, and certainly not clearly erroneous. We therefore find that Fuji's argument regarding a misplaced burden by the district court is without merit.

C

Having considered the initial allocation of the burden of proof, we now consider the merits of the district court's determination at trial that Fuji's trademarked product features are functional. "In general terms, a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.10 (1982). *TrafFix*, 532 U.S. at 35. A design is also functional where, without its use, "'competitors [are] at a significant non-reputation-related disadvantage.'" *Id.* at 32 (quoting *Qualitex*, 514 U.S. at 165). "Where the design is functional under the *Inwood* formulation there is no need to proceed further to consider if there is a competitive necessity for the feature." *Id.* at 33. The Federal Circuit maintains a helpful doctrine of de jure versus de facto functionality:

Our decisions distinguish de facto functional features, which may be entitled to trademark protection, from de jure functional features, which are not. "In essence, de facto functional means that the design of a product has a function, i.e., a bottle of any design holds fluid." De facto functionality does not necessarily defeat registrability. De jure functionality means that the product has a particular shape "because it works better in this shape."

*Valu Eng'g, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1274 (Fed. Cir. 2002) (citations omitted); *see also Black & Decker, Inc. v. Hoover Serv. Ctr.*, 886 F.2d 1285, 1291 (Fed. Cir. 1989):

To determine whether a particular product design is de jure functional, we have applied the "*Morton-Norwich* factors": (1) the existence of a utility patent disclosing the utilitarian advantages of the design; (2) advertising materials in which the originator of the design touts the design's utilitarian advantages; (3) the availability to competitors of functionally equivalent designs; and (4) facts indicating that the design results in a comparatively simple or cheap method of manufacturing the product.

*Valu Eng'g*, 278 F.3d at 1274 (citing *In re Morton-Norwich Prods., Inc.*, 671 F.2d 1332, 1340–41 (C.C.P.A. 1982)). The opinion of the district court considered various admitted evidence relating to all four of the *Morton-Norwich* factors. The district court, by considering the evidence it chose to consider, adopted this test.[1]

First, we have already discussed that Fuji owned a utility patent that disclosed the advantage of its design. *See supra* Part III.A. Second, Fuji's advertising materials touted the functions of its design:

These advertisements discuss the uniqueness of the design, materials they are made of, ring type, strength and flexibility. These advertisements usually show pictures of the guides to make customers aware of Fuji's unique designs.
    A Fuji flyer for the LV and SV line guides reflects these guides as having the "V for victory" frame design highlighting the large "V" in Victory and showing the curvature of the legs. This flyer also compares the LV and SV guides to the straight legged guides they replaced.

*Fuji* at 34 (citations omitted). This same material touts the new curved design over its straight-legged predecessors, commending its "super light, super fast, yet strong[,] no-welded one-piece frame construction." Prominent in the flyer is a notice of Fuji's '027 and '583 patents. Third, the proof indicates that custom rod builders consider the shape of line guides to be determined by their use and not "distinctive of Fuji line guides." For example, Joseph Meehan of Amtak testified that

---

[1] A similar test to the "because it works better" test, one of utilitarian advantage, is used in the Ninth Circuit. In *Disc Golf Association, Inc. v. Champion Discs, Inc*, the court considered whether chains used to catch a frisbee for a product used in frisbee golf could be protected through trademark. 158 F.3d 1002 (1998). The design had previously been the subject of a utility patent. *Id.* at 1005. The *Disc Golf* court held that the chains in the product were functional and could not be part of a trademark:

A product feature need only have some utilitarian advantage to be considered functional. This court has never held, as [the patent holder] suggests, that the product feature must provide *superior* utilitarian advantages. To the contrary, this court has suggested that "in order to establish nonfunctionality the party with the burden must demonstrate that the product feature serves no purpose other than identification." It is clear from [the patent] that the parabolic design improves "catchability" and the identification of caught discs. Those are utilitarian purposes.

*Id.* at 1007–08 (emphasis added).

"[c]ustomer perception is [that] there are only certain designs for [use as] spinning guides, casting guides, and boat guides, alternative designs would not be acceptable." Testimony also revealed that there is a "widely held belief that all other leg shapes and designs are far inferior" to the designs at issue, and that these designs are "simply the design fishing enthusiasts will buy."

Lastly, the court concluded that "the use of curved legs impact[s] the cost of producing the line guide." *Fuji* at 62. This statement is adequately supported by Fuji's own statements within its patents and trial testimony. Fuji's '027 and '684 patents claim the manufacture of a line guide from a single piece of sheet metal. *See* U.S. Patent 3,780,684 at 6:17–19; U.S. Patent 3,690,027 at 6:24. Each patent states in its specification that, "since the guide device can be manufactured requiring only a few process steps and has a relatively small number of parts, the device can be economically manufactured on a mass production scale." *Ibid.* When asked if "the shape of the legs of the guide can affect the manufacturing cost," Fuji's witness, Mitsuhiro Goto, answered "yes."

Functional designs like Fuji's line guides are available for copying by the public. "The Supreme Court in *TrafFix Devices* made clear that if a particular design is functional, other producers do not have 'to adopt a different design simply to avoid copying it.' *Antioch Co. v. W. Trimming Corp.*, 347 F.3d 150, 159 (6th Cir. 2003).

> "[C]opying is not always discouraged or disfavored" and can have "salutory effects." "[C]opying preserves competition, which keeps downward pressure on prices and encourages innovation." As the Supreme Court has advised, "[t]rade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products." Unless an intellectual property right protects a product, "competitors are free to copy at will."

*Id.* at 160 (citations omitted). "[T]rademark law cannot properly make an 'end run' around the strict requirements of utility patent law by giving equivalent rights to exclude." *Valu Eng'g*, 278 F.3d at 1273 (citing 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 7:64, 7-147 (4th ed.2001)).

In *Bonito Boats*, the Supreme Court considered the effect of state laws that granted protection similar to that granted by a patent and held that those state laws were in tension with the federal scheme and must yield.

> The offer of federal protection from competitive exploitation of intellectual property would be rendered meaningless in a world where substantially similar state law protections were readily available. To a limited extent, the federal patent laws must determine not only what is protected, but also what is free for all to use.

489 U.S. at 151. This logic is equally applicable with regard to trademark as the Supreme Court taught in *TrafFix*.

D

Fuji argues that the district court erred when it considered the utility patents as evidence of design functionality without first determining whether Fuji's trademarked product configuration was claimed in any of the patents. Br. of Appellant at 1. Fuji dissects the language of its patents in an attempt to distinguish its claims from similar features in its trademarks. In light of *TrafFix*, we find these arguments unconvincing.

*TrafFix* presented a case with facts parallel to the case at bar. The holder of an expired patent sought to enjoin a competitor from using the disclosed design by claiming that it was its trademark-protected trade dress. The Supreme Court held that the holder of an expired patent

"cannot claim trade dress protection where it 'in essence seeks protection for the [functional] design alone.' *Mktg. Displays, Inc. v. TrafFix Devices, Inc.*, 11 F. App'x 547 (6th Cir. 2001) (per curiam) (quoting *TrafFix* , 532 U.S. at 34).

> A prior patent, we conclude, has vital significance in resolving the trade dress claim. A utility patent is strong evidence that the features therein claimed are functional. If trade dress protection is sought for those features the strong evidence of functionality based on the previous patent adds great weight to the statutory presumption that features are deemed functional until proved otherwise by the party seeking trade dress protection. Where the expired patent claimed the features in question, one who seeks to establish trade dress protection must carry the heavy burden of showing that the feature is not functional, for instance by showing that it is merely an ornamental, incidental, or arbitrary aspect of the device.

532 U.S. at 29–30.

The district court weighed the evidence at trial and concluded that the product designs were functional. Fuji attempted to show that its trademarked legs' shape was "ornamental, incidental, or arbitrary." Mr. Goto testified for Fuji that the trademarked curves "were selected based on aesthetics or an ornamental design," and that "no calculations were conducted regarding the strength" of the legs. Mr. Yamamoto also opined for Fuji that "we did not calculate the strength," the selection criteria was "Mr. Ohmura's preference." In contrast, however, Fuji's own marketing materials claimed that its patented designs were light, strong, shock-absorbent, and flexible. Given the plain language of *TrafFix*, we cannot say that it was error for the district court to give more weight to the utility patents and Fuji's admissions than to its witnesses, including the experts, on the issue of functionality. The district court's weighing of the evidence is plausible. Even "had [we] been sitting as the trier of fact, [and] would have weighed the evidence differently," "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574.

To surmount this finding, Fuji argues that the district court did not put enough weight on the Supreme Court's direction that the features must be "claimed" in the utility patent. Fuji maintains that the curvature of the legs in the trademarked designs is outside the scope of its patents. This argument, as a legal argument, is well-taken. However, in this instance, Fuji's reliance upon it is unavailing because the design departure in this case is too slight not to be included by the claims of the utility patents at issue.

The Court in *TrafFix* addressed a similar question. It considered two different designs for a wind-proof sign based upon the double-spring design contained in plaintiff MDI's expired patents. 532 U.S. at 30. In the patented design, the springs were "well apart (at either end of a frame for holding a rectangular sign when one full side is the base)," while in the allegedly infringing design, the springs were close together. *Ibid.* To resolve this difference, the Court looked to evidence from a previous patent infringement lawsuit that MDI had prosecuted against a different competing manufacturer of wind-proof signs with a similar "close together" spring design. In that case, the "stand was found to infringe the patents under the doctrine of equivalents, which allows a finding of patent infringement even when the accused product does not fall within the literal terms of the claims." *Id.* at 31. The Court then concluded that, "In light of this past ruling—a ruling procured at MDI's own insistence—it must be concluded the products here at issue would have been covered by the claims of the expired patents." *Ibid.*

The *TrafFix* Court anticipated the situation where the "heavy burden of showing that the feature is not functional" might not apply because the expired patent did not literally "claim[] the features in question." *Id.* at 30.

In a case where a manufacturer seeks to protect arbitrary, incidental, or ornamental aspects of features of a product found in the patent claims, such as arbitrary curves in the legs or an ornamental pattern painted on the springs, a different result might obtain. There the manufacturer could perhaps prove that those aspects do not serve a purpose within the terms of the utility patent. The inquiry into whether such features, asserted to be trade dress, are functional by reason of their inclusion in the claims of an expired utility patent could be aided by going beyond the claims and examining the patent and its prosecution history to see if the feature in question is shown as a useful part of the invention.

*Id.* at 34. This raises two questions. First, did Fuji's patents actually claim the features in question, and two, despite Fuji's literal claims, would their patents still have covered the designs at issue here?

To determine if a patent has been infringed, a court must conduct two separate inquiries. *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1306 (Fed. Cir. 2003). First, claim construction, "determining the meaning and scope of the patent claims asserted," is a question of law that is reviewed de novo. *Ibid.*; *Boss Control, Inc. v. Bombardier Inc.*, 410 F.3d 1372, 1376 (Fed. Cir. 2005). Second, infringement, "whether literal or under the doctrine of equivalents," that is, "comparing the properly construed claims to the device accused of infringing," is a question of fact. *Ibid. See also Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001).

Literal infringement is narrow, restricted to the literal claims of a patent. However, because

patent claims must protect the inventor not only from those who produce devices falling within the literal claims of the patent but also from copyists who "make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law,"

"[t]he scope of a patent is not limited to its literal terms but instead embraces all equivalents to the claims described." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 732–33 (2002). In a simple device like a line guide, where the few functional parts can be slightly relocated or altered in shape, the doctrine of equivalents is easily applied to recognize infringement in a wider variety of duplicates. In determining infringement under the doctrine of equivalents, the operative question is: "Does the accused product or process contain elements identical or equivalent to each claimed element of the patented invention?" *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39–40 (1997). Relevant to this inquiry is "whether the missing element in the accused device 'performs substantially the same function in substantially the same way to obtain the same result.'" *Eagle Comtronics, Inc. v. Arrow Comm. Labs., Inc.*, 305 F.3d 1303, 1315 (Fed. Cir. 2002) (citations omitted). *See Warner-Jenkinson*, 520 U.S. at 40.

If the N and LR guides are held to be literal embodiments of the Fuji '027 and '504 patents, the SV and LV guides can be seen as equivalents under the doctrine of equivalents.[2] The SV design differs from the '027 patent in a minimal way; the attachment point of the dual legs is moved from

---

[2] Fuji's threatened actions against its competitors for patent infringement are solidly documented in this record. *See* JA 1898–2078. Between 1982 and 1989, Fuji threatened legal action against any "manufacturers, importers, and/or distributors that show any fishing rods having the infringing line guides at [trade shows]" in the United States. *Ibid.* Unfortunately, these designs are not disclosed on the record. Where an inventor has enforced its patent rights against a competitor in the past and subsequently seeks to enforce a trademark right against similar infringing products, it would not be unreasonable for a court to estop the trademark holder from claiming that the previously patented designs are not now functional in a trademark context.

the midline of the ring (its equator, so to speak) to a point nearer the bottom of the ring (in its southern hemisphere). Nothing is otherwise changed. Each element still "performs substantially the same function in substantially the same way to obtain the same result." The LV design is a closer case because it is missing a rear leg. However, as a device to assist the finding of functionality, it is clear that, given the purpose of the device disclosed in the '027 patent, the patent evidence increases the likelihood of finding that the LV design is also functional.

This likelihood is increased when it is noted that a patent's claims should be considered in light of the other, "intrinsic," evidence inside the patent, including the illustrations and specification. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1319 (Fed. Cir. 2005). "While the claims of a patent limit the invention, and specifications cannot be utilized to expand the patent monopoly, it is fundamental that claims are to be construed in the light of the specifications and both are to be read with a view to ascertaining the invention." *United States v. Adams*, 383 U.S. 39, 48–49 (1966). "Similarly, the mere fact that the patent drawings depict a particular embodiment of the patent does not operate to limit the claims to that specific configuration." *Id.* at 1306–07 (citation omitted).

The '027 patent, in its specification, states:

> Although one preferred embodiment of the present invention has been described and shown herein, it is to be understood that the same is illustrative in nature and not to necessarily [sic] limiting upon the scope of the teaching in its broader aspect. Many additional variations within the scope of the appended claims will occur to those skilled in the art.

Integral Guide Device for Fishing Lines, U.S. Patent No. 3,690,027 at 6:20 (filed Dec. 10, 1970) (issued Sept. 12, 1972). *See also* U.S. Patent No. 3,780,684 (issued Dec. 25, 1973). This language makes it more likely that the LV and SV models are equivalent embodiments of the patent and therefore functional designs.

Fuji argues that we must remand this case to the district court so that court can conduct a claim construction analysis in the first instance before we can evaluate the patents under the doctrine of equivalents. This argument fails, not because it is an incorrect statement of the law regarding infringement, but because the district court was never charged with determining the validity of the patents. Rather, it was evaluating and weighing the patent as evidence of functionality. *See Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1332 (Fed. Cir. 2006). The patents in this case were probative evidence, *see* Fed. R. Evid. 401, and the district court, as the trier of fact, could credit or discount the patent evidence by considering the likelihood that various features of the trademarked designs were claimed in any of the patents. Accordingly, we affirm the district court's use of Fuji's patents in its functionality analysis and hold that an evaluation under the doctrine of equivalents is appropriate in the course of this kind of factual finding.

We conclude, in light of the applicable law, that the district court's determination that Fuji's registered and claimed trademarks in its previously patented designs were functional was not clearly erroneous. The court's investigation was properly illuminated by the language of the patents, consideration of the doctrine of equivalents, and witness testimony—in short all the evidence considered during the trial.

## IV

Therefore, for all the reasons stated above, we **AFFIRM** the decision of the district court.