HELENE N. WHITE, Circuit Judge,
dissenting.
The majority’s articulation of the “key issue” presented — “whether a company can use trade-dress law to protect its functional product design from competition with a ‘copycat’ design made by another company where there is no reasonable likelihood that consumers would confuse the two companies’ products as emanating from a single source,” Maj. Op. 500 (emphasis added) — frames this appeal in a manner that assumes the very issues to be considered — whether the trade dress is functional and whether there is a reasonable likelihood of confusion — without any acknowledgment that reasonable inferences to the contrary not only exist but were accepted by a jury and the district court.
I respectfully dissent because I do not agree that Groeneveld presented insufficient evidence for a reasonable jury to find in its favor on its trade-dress infringement claim. Moreover, although I agree with the majority as to the basic legal standards governing copyright, patent, trademark, and trade-dress law, my reading of the relevant precedents does not fully comport with the majority’s interpretation and application of the law.
I would affirm the district court’s judgment because Groeneveld presented sufficient evidence to support the jury verdict, the district court did not abuse its discretion in denying Lubecore’s motion for a new trial or upholding the damages award, and the permanent injunction is appropriately limited to the United States. Lastly, I would remand for the limited purpose of instructing the district court to provide on-the-record reasons for its dismissal of Groeneveld’s federal unfair-competition claim, 15 U.S.C. § 1125(a); Ohio common-law unfair-competition claim; and Ohio deceptive trade practices act (ODTPA) claim, Ohio Rev.Code § 4165.02.
I
Groeneveld’s trade dress is the external shape and appearance of its EP0 grease pump (the Groeneveld pump), including its logo and color. Groeneveld was the exclusive manufacturer of this style pump for decades, until Lubecore began selling a similar-shaped pump. The differences between the two pumps are the company logos and plates, and bands of color. Although there was ample evidence to support a verdict for either party on Groene-veld’s trade-dress infringement claim, the jury — after listening to testimony during a seven-day trial and considering numerous exhibits — found for Groeneveld. Lubecore appeals, seeking reversal on the basis that Groeneveld failed to present sufficient evi- *522 denee for a reasonable jury to find in its favor and that the district court abused its discretion in denying its motion for a new trial and upholding the damages award.
The law governing Lubecore’s appeal is clear. We must view the evidence in the light most favorable to Groeneveld, cannot reweigh the evidence, and owe substantial deference to the jury verdict. Radvansky v. City of Olmsted Falls, 496 F.Bd 609, 614 (6th Cir.2007). The majority reweighs the facts in Lubecore’s favor notwithstanding that Groeneveld proffered evidence supporting each element of its claim: “(1) the trade dress is not functional; (2) the trade dress is distinctive in the marketplace and has acquired ‘secondary meaning,’ thereby indicating the source of the goods; and (3) the trade dress of the accused product is confusingly similar.” Gen. Motors Corp. v. Lanard Toys, Inc., 468 F.3d 405, 414 (6th Cir.2006) (citation omitted).
A.
Lubecore first attacks the district court’s decision to deny its motion for judgment as a matter of law and a new trial on the basis that Groeneveld failed to prove non-functionality. Whether a product feature is functional is a question of fact reviewed for clear error. Fuji Kogyo Co. v. Pac. Bay Int’l, Inc., 461 F.3d 675, 681 (6th Cir.2006). The appropriate focus is the overall trade dress rather than each dissected component. See Tools USA and Equip. Co. v. Champ Frame Straightening Equip. Inc., 87 F.3d 654, 658 (4th Cir.1996) (“[T]he critical functionality inquiry is not whether each individual component of the trade dress is functional, but rather whether the trade dress as a whole is functional.” (collecting case-law from the Second, Ninth, Tenth, and Eleventh Circuits for the same proposition)); cf. Antioch Co. v. W. Trimming Corp., 347 F.3d 150,157 (6th Cir.2003) (recognizing that “the district court was perhaps too categorical in summarily rejecting [the plaintiffj’s argument that the court had to consider whether the overall configuration of the album was functional, rather than focusing exclusively on its component parts”).
“In general terms, a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.” Inwood Labs. v. Ives Labs., 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). “Expanding upon the meaning of this phrase, [the Supreme Court] ha[s] observed that a functional feature is one the ‘exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage.’ ” TrafFix Devices, Inc. v. Mktg. Displays, Inc., 532 U.S. 23, 32, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001) (last alteration in original) (quoting Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159, 165, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995)).
In TrafFix, the Supreme Court principally held that our court (which had reversed in part a district court’s grant of summary judgment in favor of a competitor on the plaintiffs trade-dress claim) “gave insufficient recognition to the importance of the expired utility patents, and their evidentiary significance, in establishing the functionality of the [plaintiffs] device” — a dual-spring mechanism for keeping outdoor signs upright in adverse wind conditions. Id. at 32, 121 S.Ct. 1255. The Court then reaffirmed that the Inwood formulation, see 456 U.S. at 850 n. 10, 102 S.Ct. 2182, is the main test to determine functionality, and held that this court had erred by inquiring into the competitive necessity of the design where the device was otherwise functional. 532 U.S. at 32-33, 121 S.Ct. 1255. “Where the design is functional under the Inwood formulation there is no need to proceed further to consider if there is a competitive necessity for the feature.” Id. at 33,121 S.Ct. 1255. The Court reasoned that the dual-spring *523 design served more than the purpose of informing consumers that the sign stands were made by the plaintiff, but “provide[d] a unique and useful mechanism to resist the wind’s force.” Id. In other words, the design was “the reason the device work[ed].” Id. at 34,121 S.Ct. 1255.
Under TrafFix, the possibility of alternative designs cannot render a trade dress non-functional where it is otherwise functional under Inwood. Id. at 33, 121 S.Ct. 1255. The majority has morphed this simple principle into a holding that evidence regarding the possibility of alternative designs is irrelevant to the determination whether a design is functional. TrafFix does not so hold.[1] See 1 McCarthy on Trademarks and Unfair Competition § 7:75 (4th ed.2013) (explaining that Traf-Fix “d[oes] not [hold] that alternative designs cannot be considered as one source of evidence, along with others, in the initial determination under the Inwood engineering-driven formulation”).
To be sure, “a court is not required to examine alternative designs when applying the traditional Inwood test for functionality” because “if a product is clearly functional under Inwood, a court need not apply the competitive-necessity test and its related inquiry concerning the availability of alternative designs.” Antioch Co., 347 F.3d at 156. Post-TrafFix, however, both this court and other courts have continued to consider the possibility, or lack thereof, of alternative, functionally equivalent designs as one of several factors in determining functionality. See Fuji Kogyo Co., 461 F.3d at 685-86 (considering testimony that alternative designs would not be acceptable to consumers); see also Georgia-Pacific Consumer Prods. LP v. Kimberly-Clark Corp., 647 F.3d 723, 727-28 (7th Cir.2011); id. at 731 (considering argument about the availability of alternative designs, but concluding that the possibility of alternative designs cannot, on its own, render a design nonfunctional); Aur-Tomo-tive Gold, Inc. v. Volkswagen of Am., 457 F.3d 1062, 1072 n. 8 (9th Cir.2006) (noting that, following TrafFix, the court of appeals has reiterated that the possibility of alternative designs, among other factors, is a legitimate consideration in determining whether a product feature is functional); Valu Eng’g Inc. v. Rexnord Corp., 278 F.3d 1268, 1276 (Fed.Cir.2002) (“Nothing in TrafFix suggests that consideration of alternative designs is not properly part of the overall mix, and we do not read the Court’s observations in TrafFix as rendering the availability of alternative designs irrelevant. Rather, we conclude that the Court merely noted that once a product feature is found functional based on other considerations, there is no need to consider the availability of alternative designs, because the- feature cannot be given trade dress protection merely because there are alternative designs available.” (internal footnote omitted)). Thus, I do not read TrafFix as standing for the unqualified proposition that inquiring about possible alternative designs is error under the In-wood formulation, although (as the district court properly instructed the jury) the mere possibility of alternative designs does not render a design non-functional. Gen. Motors Corp., 468 F.3d at 417; PID 8787.[2]
*524 Applying the Inwood formulation, I disagree with the majority’s conclusion that Groeneveld presented “no evidence” that its pump’s overall design is non-functional. Groeneveld’s vice president of design and production, Willem van der Hulst, agreed that the base optimized the amount of material in the pump for its internal workings. PID 7989. However, he did not say (as the majority infers) that the irregular shape of the base was necessitated based on the pump’s internal components. Rather, he testified that the base was not “form fitted” around the internal parts, and he clarified that it is the weight of aluminum in the base that affects the cost. Van der Hulst added that the same amount of aluminum, if molded to a different shape, probably would not affect the cost of the aluminum but could affect “the cost of production to work the body,” i.e., the “machine part” of the device. PID 7989-80, 8004-05. The appropriate inference to be drawn from this testimony is that the volume of aluminum or arrangement of the internal parts could impact the pump’s function, but the irregular shape of the base is not essential to the pump’s functioning and does not affect the cost of the device. As van der Hulst made clear, the pump would cost the same even with a different shape. PID 8005. Further, although the “inside volume” of the upper cylinder reservoir is determined by “something other than human design” because the reservoir volume affects the amount of grease the pump can hold, PID 7922, 7988, 8019, it is not apparent that the cylinder’s shape is the reason the device works.
In any event, the non-functional configuration of otherwise functional components does not compel a finding that a product’s overall trade dress is functional as matter of law, and the majority’s equation of such components adding up to an overall functional design is not the law. Rather, “in order to receive trade dress protection for the overall combination of functional features, those features must be configured in an arbitrary, fanciful, or distinctive way.” Antioch Co,, 347 F.3d at 158 (emphasis added). The evidence supports a finding that the pump’s overall configuration was designed to look distinctive in the industry rather than due to functional concerns.
First, evidence that the pump’s outer appearance was not dictated by its internal functioning is sufficient. Whether a product’s design is “essential to the use or purpose of the article” or “affects the cost or quality of the article,” TrafFix, 532 U.S. at 32-33, 121 S.Ct. 1255 (emphasis added), is the appropriate inquiry. In TrafFix, the Court emphasized that “[t]he point is that the springs are necessary to the operation of the device,” “the dual-spring design provides a unique and useful mechanism to resist the force of the wind,” and “[t]he dual-spring design is not an arbitrary flourish in the configuration of [the] product; it is the reason the device works.” Id. at 30, 33, 34, 121 S.Ct. 1255. Accord Antioch Co., 347 F.3d at 158 (explaining that “where engineering necessity influence^] the configuration of the functional components,” the resulting design is functional).
In General Motors Corp., we concluded that the trade dress of a Hummer/Humvee vehicle — “the exterior appearance and styling of the vehicle design which includes the grille, slanted and raised hood, split windshield, rectangular doors, [and] *525 squared edges” — -was non-functional. 468 F.3d at 417. Of course, a vehicle’s grille, hood, windshield, doors and exterior edges serve particular functions as individual components of the vehicle, but their individualized designs on the Hummer/Humvee did not. Here too, the Groeneveld pump’s external appearance — the round and cylindrical shape of the clear reservoir, the grooves on the top and bottom of the reservoir, the particular placement of the product label and other features, and the irregular shape of the base — perform no inherently functional purpose. That its individual components (or inside volume of those components) have functional qualities does not compel a finding that the trade dress is functional.
Second, van der Hulst’s testimony — asserting that Groeneveld did not have to design its pump in the unique way it did— was not a bare denial as characterized by the majority:
Q. Did Groeneveld have to make its pump look this way on the outside because of the way it works on the inside?
A. No, no, of course not. No, no.
Q. Well, again, you say of course not—
A. You can’t — the pump wasn’t made in this way but you can put the valves inside. You can make out of the pistons horizontal or vertical, make it horizontal. You can change the shape of the reservoir round you can make also reservoirs which are square. So you can change very easily the same pump [would] function! ] the same way.
PID 7920.
A. You see the reservoir on top? This is a reservoir on top, yeah. That is the container of the [grease]. The reservoir you can make in several dimensions, yeah. You can make them in two kilos, three. We’re speaking kilos, okay. This one which you see on the table [is a] six kilo grease container, and this has to do with the time you want to [ ]come for the next ... filling....
Q. So the sizes of reservoir of ALS pumps vary then?
A. Yes, vary a lot, yeah.
PID 7922.
Q. Does the shape or outline of the pump affect the way the thing performs, the way it delivers grease throughout the system?
A. No.
Q. Explain this to the jury. It might be obvious, but I’m sorry. I’ll ask you to explain.
A. It’s like a car. No? The car go from
A to B and they’re all different. The shape has nothing to do with the function of the [car] moving from A to B, and it’s the same as the lubrication system. The only thing we have to do is create energy and that there is an outlet w[h]ere grease is coming out, how you do that, you can do it in many, many, many ways.
PID 7947 (emphasis added).
Third, I disagree with the majority’s rejection of van der Hulst’s reference to the “commercial people.” English is not van der Hulst’s first language, which I believe the jury could have reasonably taken into account in assessing his testimony. Van der Hulst explained that the commercial people provide “information of what the market wants.” PID 7920. The implication is that this company division is involved in design decisions from an aesthetic, rather than a functional, standpoint. He further testified:
Q. Were the commercial people and the sales people at Groeneveld involved in the design of the EP-0 Groeneveld pump?
A. Of course. We make — we make art impression at that time. We make some sketches. How it would look *526 like. I think we made even another model to show the pump to the people to management because there was money involved, and we needed to show what we are going to do. So they had an idea of the shape and the function is only— yeah, telling how it will function. That’s not too easy, but the shape we have to show it, yeah.
PID 7946-47 (emphasis added). A jury could infer that the design of the pump was a separate consideration from its internal functioning.
Fourth, van der Hulst explained in detail why the pump design is based on branding considerations and that the pump has a unique look in the marketplace:
A. ... [W]e were sure that this was the only possibility to make a pump which looks completely different than the other pumps at that time which were available because a lot of pumps were made with mechanical parts with bolts and screws and piece of steel, so on, and plastic. We wanted to make it different. One piece worked and finished.
Q. Why did you want to make your pump different looking than everybody else’s that was on the market?
A. Yeah. It’s just a challenge. It’s a challenge of designer and each-let’s say you want to make something different than everybody else....
So we want to give it a groove look.
So this has to be our pump for many, many years and has to be good and nice.
Q. And was the Groeneveld EP-0 pump different looking than everybody else’s on the market?
A. At that time, yes. Yes, of course.
Q. And what about over the last 30 years?
A. We had a lot of success with this pump. Groeneveld went all over the world with this pump. We created a lot of distributors everywhere, and we were very successful with this pneumatic system, and we still are.
Q. Over the last 30 years, did anybody else’s ALS pump look like Groeneveld’s, other than what we have here on the table now?
[A.] No, no.
Q. Did new products come on the market, ALS pumps over the last 30 years? A. Yes, there is a lot of produce of lubrication pumps, lubrication system, Japanese, Chinese, also Europe, different producers, smaller ones, but they all have their own systems in a way, and they look all different, all different.
PID 7909-11 (emphasis added).
Q. You said that the Echo or the Sterk pump we were just looking at is a terrible pump. What’s terrible about it?
A. Yeah, only the look. I have nothing to say about the quality because probably is a perfect pump, and so it’s only the look which I mention, yeah.
Q. Was that — was that important to you or a factor in the way you chose to engineer the Groeneveld pump way back in the way it looked, and not looking terrible and all those things you just described?
[A.] Yeah, I think so because the Groe-neveld was — at that time, a very young company with young managers. Mr. Groeneveld, especially, he had very good choice. He like nice things. We had a nice office, nice cost, nice people. So we were different than the really old mechanical people. Let’s say it in this way. We were a sales company, we did a lot of promotion, and there’s a reason why we wanted to do something else[.] •
PID 7923-24.
Q. Do you know this is a grease jockey pump?
A. A grease jockey pump.
*527 Q. Meaning Exhibit 42?
A. Yeah.
Q. Would you have wanted to design and create, make something that looks like this?
A. No, they[’d] fire me probably.
(Laughter.)
Q. And why, if it works, what does anybody care what it looks like?
A. You see nowadays the cars, even trucks, nowadays, new truck is nicer than a personal car inside. The shape on the cars, the wheels, the tire protection, the tanks, the air tanks, it’s unbelievable nice. Not only a car would go from A to B. No, they want also to make something nice. So when you put something on a chassis of an owner of a truck with truck for a lot of money, he bought all kinds of chrome insulation, lights and nice things, and then you put this on the chassis. It’s terrible, huh?
PID 7944-45.
Although the pump’s trade dress is not an ornamental feature per se like certain components of luxury cars, an ALS pump can be a visible component of a truck. App. 323-35. And for the consumer, its unique look causes immediate brand recognition. PID 8199. Van der Hulst testified that, although it costs more to manufacture nowadays, the pump’s overall appearance has remained the same since it was first produced in the 1980s because the industry associates it with Groeneveld. PID 7930-31, 8005-06.
Leatherman Tool Group v. Cooper Industries, 199 F.3d 1009 (9th Cir.1999), does not support the majority’s result. In Leatherman, the Ninth Circuit concluded that a competitor was entitled to judgment as a matter of law on Leatherman’s trade-dress claim because the overall appearance of Leatherman’s Pocket Survival Tool (PST) was functional. Applying the principle “that[,] in a product configuration case[,] there must be some aspect to the configuration which is nonfunctional,” id. at 1013 n. 6, the Ninth Circuit reasoned:
... [TJhere is no evidence in the record which supports the jury’s conclusion that the overall appearance of the PST is protectable trade dress. To be sure, the PST has an appearance, as every physical object must. There is no evidence, however, that anything about that appearance (other than the Leath-erman name) exists for any non-functional purpose. Rather, every physical part of the Leatherman is de jure functional. No witness pointed to any feature of, or marking on, the PST (other than the Leatherman name) which was ornamental or intended to identify its source. Rather, the evidence showed ... that the product is in its particular shape because it works better in this shape. Indeed, the designer of the PST repeatedly testified as to his belief in the truth of Leatherman’s claims as to the superiority of the PST design.
... [Although the] trade dress must be viewed as a whole, ... where the whole is nothing other than the assemblage of functional parts, and where even the arrangement and combination of the parts is designed to result in superior performance, it is semantic trickery to say that there is still some sort of separate “overall appearance” which is non-functional.
Id. at 1013 (internal citation, quotation marks, and emphasis omitted). The Ninth Circuit also noted that “the evidence here was unequivocal that none of the alternative[ ] [designs] offered the same functionality as the PST.” Id.
Unlike Leatherman, there was ample evidence that the Groeneveld pump’s design was intended to identify its manufacturer and does in fact identify its manufacturer in the marketplace. Moreover, as discussed supra, van der Hulst’s testimony *528 supports a finding that the pump’s design was based on aesthetic considerations, the shape does not dictate the pump’s function, other designs would result in the same function, and the design does not result in superior performance or cost effectiveness.[3]
In sum, although the jury might have decided otherwise, there was sufficient evidence to support a finding that the Groe-neveld pump’s trade dress is not based on engineering or cost concerns, but was “selected for [its] distinctiveness.” Ferrari S.P.A. v. Roberts, 944 F.2d 1235, 1247 (6th Cir.1991); see Cybergun, S.A. v. Jag Precision, No. 2:12-CV-0074, 2012 WL 4868104, at *5 (D.Nev. Oct. 11, 2012) (holding that an overall configuration serves a nonfunctional purpose when it identifies the product as a specific product made by a specific manufacturer), ajfd, — Fed.Appx.-, No. 12-17640, 2013 WL 3770855 (9th Cir. July 19, 2013).
B.
Lubecore also asserts that there was insufficient evidence to submit the issue of secondary meaning to the jury. “Secondary meaning is used generally to indicate that a mark or dress has come through use to be uniquely associated with a specific source.” Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 766 n. 4, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). “To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself.” Inwood Labs., 456 U.S. at 851 n. 11, 102 S.Ct. 2182. We consider seven factors to determine whether a trade dress has secondary meaning: “(1) direct consumer testimony, (2) consumer surveys, (3) exclusivity, length, and manner of use, (4) amount and manner of advertising, (5) amount of sales and number of customers, (6) established place in the market, and (7) proof of intentional copying.” Gen. Motors Corp., 468 F.3d at 418. “No single factor is determinative and every one need not be proven.” Herman Miller, Inc. v. Palaz-zetti Imports & Exports, Inc., 270 F.3d 298, 312 (6th Cir.2001). The secondary meaning of a plaintiffs trade dress must exist prior to a competitor’s alleged infringement. See Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc., 871 F.2d 590, 596 (6th Cir.1989).
Except for consumer surveys, Groene-veld presented evidence supporting all the remaining factors that, if believed, support a jury’s finding of secondary meaning. Herman Miller, 270 F.3d at 313, 315 (explaining that the absence of consumer surveys is not fatal to a create a triable claim). Consumer testimony established that the Groeneveld pump has been recognized by its appearance for many years. PID 4373, 4394, 8199. Even Lubecore’s founder, Jan Eisses, conceded that the pump is recognizable by its shape, although he qualified that it “also” can be recognized by the name and label. PID 8729-30. There is no dispute that Groene-veld exclusively used its unique design for decades before Lubecore made a similar-shaped pump. As to advertising, the Groeneveld pump is “displayed clearly on *529 all of [its] promotional materials” and “it is a predominant part of [the company’s] corporate image.” PID 8293-94 (testimony of Gail Wilson, Groeneveld’s chief financial officer); see PID 8302-10 (Wilson explaining the investment in advertising that incorporates images of the pump); App. 371-79 (evidence establishing the company’s significant trade show attendance). The revenue from the sale of the Groene-veld pump is significant. PX 39 (sealed). There is no dispute that Groeneveld is an industry leader (and has been for quite some time), PID 8198, 8304, or that its pump is well known in this industry.
Finally, as the majority acknowledges, “[t]he similarities in the two pumps’ appearance (excluding the labels), the fact that other manufacturers’ pumps do not have a similar look, and the fact that Lube-core’s founder used to be a Groeneveld employee constitute circumstantial evidence of an intent to copy.” Maj. Op. 511. This evidence is strong; it is implausible that Lubecore’s pump, by sheer coincidence, just happened to be manufactured with an identical shape as the Groeneveld pump. Evidence of intentional copying “is especially helpful to establishing secondary meaning because there is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence.” Herman Miller, 270 F.3d at 314 (internal quotation marks omitted).
When a newcomer to the market copies a competitor’s trade dress, its intent must be to benefit from the goodwill of the competitor’s customers by getting them to believe that the new product is either the same, or originates from the same source as the product whose trade dress was copied.
Osem Food Indus. Ltd. v. Sherwood Foods, Inc., 917 F.2d 161, 165 (4th Cir. 1990), as quoted in Herman Miller, 270 F.3d at 314.
The record amply supports a finding that “the unique exterior design and shape of’ the Groeneveld pump constitutes its trade dress and has acquired a secondary meaning, which makes it distinguishable from other ALS pumps. Ferrari, 944 F.2d at 1240.
C.
Turning to the last element, the majority concludes that Groeneveld failed to prove likelihood of confusion. We consider eight factors in determining whether the trade dresses of competing products present a likelihood of confusion: “1. strength of the plaintiffs [trade dress]; 2. relatedness of the goods; 3. similarity of the [trade dresses]; 4. evidence of actual confusion; 5. marketing channels used; 6. likely degree of purchaser care; 7. defendant’s intent in selecting the [trade dress]; [and] 8. likelihood of expansion of the product lines.” Frisch’s Rest., Inc. v. Shoney’s Inc., 759 F.2d 1261, 1264 (6th Cir. 1985) (formatting altered).
Although the ultimate determination whether a set of facts establishes a likelihood of confusion is a legal conclusion subject to our de novo review, we have held that the issue of confusion is more appropriately resolved by the fact-finder, rather than by the court as a matter of law, when a case presents a factually-intensive close call and the factors are balanced. Innovation Ventures, LLC v. N.V.E., Inc., 694 F.3d 723, 731, 733 (6th Cir.2012).
The majority concludes that the “different branding of the two grease pumps and the high degree of care presumably exercised by the pumps’ sophisticated consumers ... compel the conclusion that, as a matter of law, Groeneveld has failed to carry its burden of raising a triable issue regarding the likelihood of confusion.” Maj. Op. 511. The majority begins its analysis with a side-by-side comparison of *530 the pumps: “The former is green with a large ‘G’ mark and says ‘GROENEVELD’; the latter is red with a maple-leaf mark and says ‘lubecore.’ ” Id. at 509-10. Because of the label/branding differences that- appear on the pumps and in advertising, the majority finds that “no reasonable consumer would think that the two grease pumps belong to the same company.” Id.
The similarity factor, however, “entails more than a simple side-by-side comparison of the [trade dresses] in question.” Therma-Scan, Inc. v. Thermoscan, Inc., 295 F.3d 623, 633 (6th Cir.2002). Accord Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc., 931 F.2d 1100, 1109 (6th Cir.1991) (“[I]t is axiomatic in trademark law that side-by-side comparison is not the test.” (internal quotation marks omitted)). Instead, the trade dresses “must be viewed in their entirety and in context. A court must determine, in the light of what occurs in the marketplace, whether the [trade dress] will be confusing to the public when singly presented.” Homeowners Grp., 931 F.2d at 1109 (internal quotation marks and alterations omitted). This rule is “to account for the possibility that sufficiently similar [trade dresses] may confuse consumers who do not have both [trade dresses] before them but who may have a general, vague, or even hazy, impression or recollection of the other party’s [trade dress].” Daddy’s Junky Music Stores v. Big Daddy’s Family Music Ctr., 109 F.3d 275, 283 (6th Cir.1997) (internal quotation marks omitted); see AutoZone, Inc. v. Tandy Corp., 373 F.3d 786, 795 (6th Cir. 2004) (confirming the “anti-dissection rule”). Record evidence supports a finding that the pumps look similar despite the different labels. PID 4393-94 (consumer testimony: “Q. Does anything about that label tell you that it was manufactured at a facility different than where Groeneveld has its factory? A. No. It could be manufactured at the same place. I mean you look at the base and everything is pretty much the same.”).
Abercrombie & Fitch Stores v. American Eagle Outfitters, 280 F.3d 619 (6th Cir.2002), does not compel a different result. In Abercrombie, we affirmed the district court’s grant of summary judgment for American Eagle Outfitters (AE) on Abercrombie & Fitch’s (A & F) trade-dress claim related to its catalog design, reasoning that AE’s catalog was, as a matter of law, not confusingly similar to the A & F Quarterly. We summarized the following differences between the two catalogs: 1) although A & F and AE use similar formats to display their goods, AE “puts significantly fewer garments on each page than A & F does and presents its clothes in a spare, as opposed to dense, fashion”; 2) AE “uses colorbars and design bars underneath almost all its garments, while A & F does so occasionally”; 3) “[t]he most striking visual difference between the catalogs lies in the photographs,” given that “A & F makes extensive use of photographs depicting apparently college-aged people in often erotic or homoerotic poses,” whereas AE’s photographs presented “people of various ages in non-suggestive, often family-oriented situations”; 4) absent from AE’s catalog “is the sort of campy sketchwork that dominates much of A & F’s editorial content”; 5) AE’s “makes sparing use of lifestyle editorial content,” and its editorial subjects are “often radically different” from A & F’s; and 6) each company displays its name and mark on nearly every page of its catalog. Id. at 646-47.
Given these differences, we reasoned that “[n]o rational trier of fact could conclude that the overall appearances created by the configuration of the two catalogs are similar” because they “contain too many significant dissimilarities, in terms of both style, layout, and content, along with the ubiquitousness of the producers’ re *531 spective trademarks constantly indicating — on practically every page — the catalog’s origin[.]” Id. at 647-48. Abercrombie thus does not hold that a distinction in labeling alone makes a competitor’s trade dress, as a matter of law, not confusingly similar where it is otherwise an identical copy of the plaintiffs trade dress. Rather, Abercrombie reaffirms that we must examine the appearance of two products as a whole and in context.
The majority’s second basis for discarding the jury verdict is the “high degree of care presumably exercised by” consumers of ALS pumps due to the price of such pumps. Maj. Op. 511 (emphasis added). Even when combined with label differences, this presumed fact does not compel, as a matter of law, the conclusion that there can be no likelihood of confusion. In Maker’s Mark Distillery, Inc. v. Dia-geo North America, Inc., we affirmed the district court’s judgment in favor of the Bourbon-distiller plaintiff in an infringement case where its competitor used a similar trade-dress element — a red dripping wax seal — on its tequila bottles. 679 F.3d 410, 414 (6th Cir.2012). With respect to likelihood of confusion, we upheld the district court’s finding that the similarity factor narrowly favored the plaintiff and should be given considerable weight, despite the fact that the competitor’s product included a house mark, i.e., a product label “identifying the name of the manufacturer.” Id. at 422-23. We approved the district court’s finding that such label differences are not dispositive and rejected the proposition that our case-law “stand[s] for the proposition that the presence of a house mark always has significant weight in the similarity analysis[.]” Id. at 422; see Thermo-Scan, Inc., 295 F.3d at 634 (“The presence of [a] label on [a competitor’s product] ... does not eliminate the similarity between the [trade dresses]. Instead, this labeling diminishes the likelihood of confusion created by the comparable [trade dresses] and reduces the importance of this factor.”). Further, we emphasized that the district court’s finding was also supported by its reasoning that: (1) “testimony in the record indicate[d] that many consumers are unaware of the affiliations between brands of distilled spirits, and that some companies produce multiple types of distilled spirits”; and (2) unlike a claim based on a simple palming-off theory, “when the two products are related enough ... one might associate with or sponsor the other and still use their own house mark.” 679 F.3d at 422.
Moreover, we held that even though the factor of consumer care clearly favored the competitor, this factor was “not disposi-tive” to override the district court’s findings because “[c]onfusingly similar marks may lead a purchaser who is extremely careful and knowledgeable ... to assume nonetheless that the seller is affiliated with or identical to the other party.” Id. at 423 (internal quotation marks omitted). We summarized that the plaintiffs mark was “extremely strong”; the “most important Frisch factors” are similarity and strength of the mark; and the degree of consumer care, even though given substantial weight, could not overcome the strength of the plaintiffs mark and the similarity (despite apparent labeling differences). Id. at 422, 424; see 4 McCarthy on Trademarks and Unfair Competition § 23:53 (“The majority view is that labeling or use of a word mark does not avoid what would otherwise be an infringing trade dress.”).[4]
*532 Here, in denying Lubecore’s motion, the district court found:
[Although] Lubecore’s label and color are different than Groeneveld’s, there is sufficient evidence from which the jury could have concluded that the products were confusingly similar despite the difference in markings given the testimony regarding corporate mergers and acquisitions in the industry; the fact that many pumps bear multiple company names; and, the fact that labels may not be the brand identifiers relied on in this industry.
Groeneveld Transp. Efficiency v. Lubecore Int’l, No. l:10-cv-702, 2012 WL 1142512, at *4 (N.D.Ohio Apr. 4, 2012).
The majority rejects these points (which are reiterated by Groeneveld on appeal) as irrelevant. To the contrary, facts that undermine presumed consumer care in differentiating between products are relevant to the overall analysis, and dissimilarities in the trade dresses based on labeling have less weight in the context of such industry-specific evidence. See Maker’s Mark Distillery, 679 F.3d at 422.
Moreover, the majority errs in its conclusion that the record does not support a finding that labels are not the primary brand identifiers in the industry. PID 4251 (“[M]y last thing that I would say that I could tell them [ (i.e., different pump models, namely the Bijur, Grease Jockey or EcoStar) ] all apart is the label.”), 8169 (“Q. There w[ere] questions about the labels and my question to you is how do you recognize the different pumps that are in your market? A. They all look much different than ours, than the Groeneveld pump. Q. Do you rely on the label to make that assessment? A. No.”), 8201 (“Q. Do you identify it based on the label or some other feature that is visible to you? A. No. As far as the label, no, I wouldn’t. The — it’s more of the — it’s just more of the design of it again.”); 8238 (“The core element of the brand identification is the design of the product itself and then it’s [sic] labeling and the green color and the identification plate.”).[5]
Lubecore is a new company with a minimal brand recognition in the United States. This fact is relevant because it undercuts the weight placed on the different brand labeling; even a sophisticated consumer cannot be expected to recognize brands that have little name recognition or have been in existence only a short time. PID 8129-30 (testimony of independent distributor about his first encounter with a Lubecore pump: “I really didn’t know what was going on. I was shocked to see that it looked that close. Again, it looked to me like they had taken a decal of the Lubecore and put it over the top of a Groeneveld pump, and I’ve known these pumps for a long time and I mean looking at it, it was identical.... I didn’t know *533 there was such a thing as Lubecore, and this looked like the Groeneveld product.”). Further, the lack of brand recognition undermines the weight the majority accords to the lack of evidence of actual confusion. See Maker’s Mark Distillery, 679 F.3d at 423 (placing little weight on the lack of evidence of actual confusion where the competitor’s product was sold for a short time and in limited quantities).
Like the majority, I now turn to consider all of the Frisch factors to conduct an overall assessment.
1. Lubecore’s intent in copying Groe-neveld’s trade dress
I agree with the majority insofar as it holds that “[ijntentional copying ... is not actionable under the Lanham Act absent evidence that the copying was done with the intent to derive a benefit from the reputation of another.” Ferrari S.P.A., 944 F.2d at 1243 (internal quotation marks omitted).
[However, i]f a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity. Intent is relevant because purposeful copying indicates that the alleged infringer, who has at least as much knowledge as the trier of fact regarding the likelihood of confusion, believes that his copying may divert some business from the senior user. Direct evidence of intentional copying is not necessary to prove intent.
Daddy’s Junky Music Stores, 109 F.3d at 286 (internal quotation marks and citations omitted); see Larsen v. Terk Techs. Corp., 151 F.3d 140, 149 (4th Cir.1998) (“[Cjourts have almost unanimously presumed a likelihood of confusion upon a showing that the defendant intentionally copied the plaintiffs trademark or trade dress.”); Frisch’s Rest., 670 F.2d at 648 (explaining that “[t]he intent of [a party] in adopting [another’s trade dress] is a critical factor” (internal quotation marks omitted)); Ferrari S.P.A., 944 F.2d at 1243 (placing weight on the “presumption of likelihood of confusion that follows from intentional copying”).
I also agree with the majority that copying is not per se illegal and that evidence of intentional copying is not necessarily dispositive of the likelihood-of-confusion analysis. For example, we have held that a plaintiff could not rely this factor where the plaintiffs mark was not strong and the competitor’s alleged copy was not very similar to the plaintiffs trade dress. Gray v. Meijer, Inc., 295 F.3d 641, 650-51 (6th Cir.2002). Although “a presumption of intent to confuse arises when evidence of copying is presented,” courts “recognize that if there is no real issue of a likelihood of confusion [due to the lack of evidence supporting other factors], evidence of copying is of no import.” Id. at 651 (internal quotation marks omitted)
However, unlike the majority, I do not read these precedents — or the broader policy implications underlying the roles of copyright and patent law versus trademark law — to mean that Lubecore’s intent to copy is “of no help” to Groeneveld. Eisses’s testimony established that: 1) he instructed Martin Vermeulen (another former Groeneveld employee) to make a pump for Lubecore, and told him what he “like[d] about the Groeneveld pump and other pumps in the industry”; 2) the Lubecore pump looks similar to the Groe-neveld pump; 3) “Groeneveld is recognized” in the industry and certain versions of its pump have a good reputation; 4) he would prefer that the Lubecore pump not look like the pump of a company with a bad reputation; 5) the Lubecore website says it takes twenty years to build a reputation and that it would matter to him if the Lubecore pump looked like a Groene-veld pump if Groeneveld had a bad reputa *534 tion; and 6) he could identify a Groeneveld pump by the shape of it, but then qualified “also because the name and the labeling on it.” PID 8725-30.
Eisses further testified on cross-examination:
Q. So, sir, you wanted it to look like the Groeneveld because you knew about Groeneveld’s reputation, market presence, and place in the industry, didn’t you?
A. I have no objection with it looking like a Groeneveld.
Q. In fact, you like that, and you like enjoying the benefits of that, don’t you?
A. It’s a good pump.
Q. Otherwise, you would make it differently, wouldn’t you?
A. It would have been up to Martin.
PID 8730 (emphasis added).
Eisses’s answers on cross-examination are compelling circumstantial evidence that Lubecore intentionally copied the Groeneveld pump to benefit from Groene-veld’s established reputation, which under our case-law supports the inference that Lubecore sought to confuse consumers. In addition, Lubecore’s extended warranty program also specifically targets Groene-veld customers and products, offering that “Lubecore will extend your current Groe-neveld grease warranty from five years to the Lubecore six years” and that “Lube-core will honor the replacement of parts under the Groeneveld warranty from the original date of purchase.” PID 8690. Lubecore represents to Groeneveld consumers that if they use Lubecore grease, Lubecore will extend the warranty on the Groeneveld pump. (Eisses testified that Lubecore would typically replace the Groe-neveld pump with a Lubecore pump if something went wrong with a component of the Groeneveld pump). PID 8692-93. Groeneveld is the only competitor targeted by Lubecore’s warranty program. PID 8693-94. Drawing all inferences in Groe-neveld’s favor, Lubecore’s marketing practices also support the inference of its intent to cause confusion among consumers in associating the two pumps, as an unaffiliated company normally does not (and cannot) extend another company’s warranty.
In any event, even if the record were devoid of evidence supporting the intent factor, the majority incorrectly concludes that the absence of intent “cautions against allowing the issue [of confusion] to go to the jury” and “weights] in Lubecore’s favor.” Maj. Op. 516, 520. Our case-law instructs:
[E]ven if the [district [c]ourt correctly had ruled as a matter of law that defendant did not copy plaintiffs marks intentionally, the [district [c]ourt misunderstood the legal significance of this lack of intent by finding that it decreased the likelihood of consumer confusion. As noted, the presence of intent can constitute strong evidence of confusion. The converse of this proposition, however, is not true: the lack of intent by a defendant is largely irrelevant in determining if consumers likely will be confused as to source. Intent therefore is an issue whose resolution may benefit only the cause of a senior user, not of an alleged infringer.
Daddy’s Junky Music Stores, 109 F.3d at 287 (internal quotation marks and citations omitted).
2. Strength of Groeneveld’s trade dress
The majority acknowledges that “th[e] evidence is sufficient to support a factual finding that Groeneveld’s trade dress is strong.” Maj. Op. 516. The majority, however, opines that “such a finding is of no help to Groeneveld in the absence of any evidence that consumers are likely to confuse the source of the competing grease pumps.” Id. But a finding that Groene- *535 veld’s trade dress is strong is evidence that bears on the overall likelihood-of-confusion assessment. Our precedents instruct that the strength of Groeneveld’s trade dress is significant to that assessment. See Maker’s Mark Distillery, 679 F.Sd at 424 (“[W]e have said that the ‘most important Frisch factors’ are similarity and strength of the mark[.]” (quoting Gray, 295 F.3d at 646)).
3. Relatedness of the goods
The majority also acknowledges that “[t]he parties do not dispute that Groene-veld’s and Lubecore’s grease pumps perform the same function and directly compete in the industry.” Maj. Op. 516-17. But once again, the majority repeats its error by stating “[s]o this factor would also favor Groeneveld if it had any proof of the likelihood of confusion.” Id. To the contrary, under Frisch, this factor bears on the overall assessment whether there is a likelihood of confusion.
4. Similarity of the trade dresses
Despite the fact that the shapes of the two pumps are virtually identical, the majority finds that this factor weighs “heavily” against Groeneveld because of the different labels. As discussed supra, there is no clear error in the district court’s finding that different labels did not render the products dissimilar given other industry-specific evidence. This factor, at minimum, narrowly favors Groeneveld.
5. Evidence of actual confusion
The majority acknowledges that the lack of evidence of actual confusion is not dis-positive to this analysis. See Maker’s Mark Distillery, 679 F.3d at 422 (explaining that a lack of evidence of actual confusion “is rarely significant,” and upholding the district court’s finding that the lack of such evidence was non-determinative); Frisch’s Best., Inc., 759 F.2d at 1267 (explaining that “proof of actual confusion is not necessary”). Thus, a reasonable jury could find for Groeneveld in the absence of this factor, depending on the evidence, or lack thereof, supporting the other factors.
6. Marketing channels used
I agree with the majority that “[t]he record contains evidence that both parties often attended the same industry trade shows, that they marketed their products over the Internet, and that certain distributors sold both parties’ ALS systems. Such evidence is sufficient to show that there is a commonality in how the ALS systems are marketed.” Maj. Op. 517. Unlike the majority, however, I do not consider such evidence inconsequential, especially in conjunction with the visual similarity of the trade dresses and weight of the other factors. See Homeowners Grp., Inc., 931 F.2d at 1110 (explaining that “[tjhis factor is very significant in illuminating what actually happens in the marketplace and, where other factors are not particularly probative, is of special importance,” but that other facts, such as dissimilarities, may lessen the possibility of confusion).
7. Likely degree of purchaser care
I cannot agree with the majority’s assessment that this factor “strongly favors Lubecore” because, as discussed supra, Groeneveld presented evidence that undermines the presumption of consumer care. Drawing inferences in Groeneveld’s favor, this factor, at most, only slightly favors Lubecore. In any event, as already discussed, this factor is not dispositive.
8. Likelihood of market expansion
We have explained:
A strong possibility that either party will expand [its] business to compete with the other or be marketed to the same consumers will weigh in favor of *536 finding that the present use is infringing. A geographic expansion or an increase in the types of products or services offered can be relevant. A finding that the parties will not expand their markets significantly, however, does not address the ultimate issue of likelihood of confusion.
Daddy’s Junky Music Stores, 109 F.3d at 287 (internal quotation marks, citations, and alteration brackets omitted). Witnesses for both parties testified that there was potential for growth in the United States. PID 8244-45 (Jennifer Wolfe, IP lawyer and consultant), PID 8589 (Eisses: “[W]e have plans to move into the United States and to build a company. It’s a big opportunity. The market is ten times as large as Canada.”).
9. Summary
Except for the lack of evidence of actual confusion, and even weighing the consumer-care factor in Lubeeore’s favor, the remaining factors either favor Groeneveld or are neutral. Moreover, even under the majority’s weighing of the factors, there is a three-to-four split which militates in favor of a jury determination rather than a ruling as a matter of law. Innovation Ventures, 694 F.3d at 733 (“[W]hen the factors, as found by the district court, were so evenly balanced — a 4 to 3 split, with the eighth factor not at issue in this case— precedent counsels in favor of not granting summary judgment.”). On this record, a reasonable jury could find that the Lube-core pump is likely to confuse consumers.
D.
Lubecore raises various challenges to the jury’s damages award. Its arguments were rejected by the district court in a well-reasoned opinion, see Groeneveld Transport Efficiency, 2012 WL 1142512, at *4-5, and I discern no basis to hold that the district court abused its discretion in finding the jury award reasonably supported. See Advance Sign Grp., LLC v. Optec Displays, Inc., 722 F.3d 778, 787 (6th Cir.2013) (“Our review of a jury’s damage award is extremely deferential, and we will not order a remittitur or new trial unless the award is contrary to all reason.”).
II.
I now turn to Groeneveld’s cross-appeal.
A.
Groeneveld challenges the district court’s decision to grant Lubecore’s motion for judgment as a matter of law (made before the case was submitted to the jury) on its federal unfair-competition, Ohio common-law unfair-competition, and ODT-PA claims.[6] The district court provided no explanation for its dismissal of these claims, beyond opining: “I’ve listened to everything, believe me.” PID 8763. Both in Lubecore’s oral trial motion and on appeal, its argument urging dismissal of these claims is coextensive with its argument that insufficient evidence supported Groeneveld’s trade-dress infringement claim.
Because it is unclear from the record why Groeneveld’s remaining claims were dismissed, I would remand.
B.
Groeneveld urges this court to broaden the scope of the district court’s permanent injunction to include Canada. I do not find this issue moot because, unlike the majority, I would not dissolve the injunction. Nevertheless, it is without merit.
The district court did not expressly address Groeneveld’s request for the injunc *537 tion to proscribe conduct in Canada but limited relief to Lubecore’s infringing conduct in the United States. To establish whether “circumstances call for extraterritorial application of the Lanham Act,” courts have traditionally considered: “(1) whether the defendant’s conduct has a substantial effect on commerce in the United States; (2) whether the defendant is a citizen of the United States; and (3) whether there exists a conflict between defendant’s trademark rights established under foreign law, and plaintiffs trademark rights established under domestic law.” Libbey Glass, Inc. v. Oneida Ltd., 61 F.Supp.2d 720, 722 (N.D.Ohio 1999) (citing Vanity Fair Mills v. T. Eaton Co., 234 F.2d 633, 641 (2d Cir.1956)); see Steele v. Bulova Watch Co., 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 319 (1952) (holding that federal courts have jurisdiction to apply the Lanham Act extraterritorially).
Lubecore is not a U.S. citizen but a Canadian corporation, which weighs heavily against extraterritorial application of the Lanham Act. See Aerogroup Int’l, Inc. v. Marlboro Footworks, Ltd., 955 F.Supp. 220, 227 (S.D.N.Y.1997). On the other hand, the parties agree that there is no conflict with foreign law (as Lubecore has no claim to the trade dress in Canada) and thus there would be no interference with Canadian sovereignty if the Lanham Act were applied against Lubecore in Canada.
Groeneveld’s central argument is that Lubecore’s Canadian activities have a substantial effect on United States commerce, but its discussion rests on speculation— that it is “likely” that Canadian trucks with installed Lubecore pumps will cross in and out of the United States and that Lubecore pumps marketed and sold in Canada are “likely” to affect sales and Groeneveld’s reputation in the United States. Even if (as Groeneveld asserts) U.S. consumers can access Lubecore’s web sites and order products online, that does not prove that Lubecore’s Canadian activities have a substantial effect on domestic commerce. Although it is true that Eisses desired to expand his business in the United States, Groeneveld’s assertion that Lubecore’s strategy is to “lay the groundwork in Canada for expansion into the U.S.” presupposes that Lubecore will violate the district court’s injunction and is unsupported by record evidence. The most Groeneveld has shown is the possibility that Lubecore’s foreign activities might impact commerce in this country, but that is not enough to extraterritorially apply the Lanham Act.
III.
For these reasons, I dissent.

. Nor does TrafFix hold that consideration of alternative designs is appropriate only in cases of "esthetic functionality.”

. As one commentator has reasoned:
I cannot believe that the Supreme Court in TrafFix meant, in [a] back-handed way, to overrule decades of precedent which has used alternatives els another source of evidence to resolve the difficult puzzle of functionality. I think that, as a matter of policy, consideration of alternatives can assist expert witnesses (and judges) in reaching a sound opinion (or decision) as to why a shape is or is not "functional” under the Inwood test. More, not less, evidentiary light should be permitted to shine on the problem. In TrafFix, the Court said that the “principal question” to be decid *524 ed was not the relevance of alternatives, but was the significance of the presence of the alleged trade dress features in a utility patent It was this which created “strong evidence’’ of functionality in the TrafFix case.
1 McCarthy, supra, § 7:75 (capitalization of internal case names altered). Here, there is no utility patent that touts the utilitarian advantages of the Groeneveld pump’s design.

. The Ninth Circuit further stated that “the only reasonable conclusion is that the overall appearance of the PST is not protectable as trade dress, at least as against a competitor which clearly marks its own product with a distinct name and who uses distinct packaging.” 199 F.3d at 1014. As the Ninth Circuit held that the only non-functional component of the PST was the product name, it noted the difference in product labeling and packaging to emphasize that Leatherman’s competitor did not copy the one plausibly protected component of its trade dress. It did not reach a separate conclusion on the likelihood-of-confusion factor.

. Cf. Boston Athletic Ass’n v. Sullivan, 867 F.2d 22, 30 (1st Cir.1989) ("[F]ew would be stupid enough to make exact copies of another's mark or symbol. It has been well said that the most successful form of copying is to employ enough points of similarity to confuse the public with enough points of difference to confuse the courts.”); Induct-O-Matic Corp. v. Inductotherm Corp., 747 F.2d 358, 364-65 *532 (6th Cir.1984) ("It has been observed that the expertise of purchasers does not always assure the absence of confusion.... Being skilled in their own art does not necessarily preclude [consumers from] mistaking one trademark for another when the marks are as similar as those here in issue, and cover merchandise in the same general field." (internal quotation marks omitted)).

. The majority opines that the "most that the cited testimony shows is that certain witnesses were able to distinguish Groeneveld’s pumps from pumps other than Lubecore’s without even looking at the labels, which says nothing about whether a consumer would be able to distinguish a Groeneveld pump from a Lubecore pump with the labels.” Maj. Op. 511. But evidence that ALS pumps are identified based on the overall design rather than the label does, indeed, say something about whether consumers would be able to distinguish a Groeneveld pump from a Lubecore pump based on the labels alone where they are otherwise similar; it supports the inference that labels are not necessarily indicative of the product’s manufacturer as the consumer’s focus in this industry is on the design.

. Because Groeneveld abandons its other claims, I deem those waived.